STERLING NEWELL AND W. E. CLARK, EXECUTORS UNDER THE WILL OF CHARLES C. INGALLS, DECEASED, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 57835. Promulgated March 3, 1932.

*Sterling Newell, Esq., W. E. Clark, Esq.,* and *Paul L. Holden, Esq.,* for the petitioners.
*Lewis S. Pendleton, Esq.,* for the respondent.

OPINION.

SMITH: The decedent's holdings in the preferred and common stock of the Ingalls Stone Company, constituting 85.27 per cent and 87.96 per cent, respectively, of the total, were returned for estate-tax pur-

poses at $75 per share for the preferred and $154.10 per share for the common. The respondent has determined deficiencies by valuing the preferred stock at $100 per share and the common stock at $250 per share. The sole question for our determination is the fair market value of the holdings of the decedent in the Ingalls Stone Company at the date of his death, October 24, 1928.

To sustain their contentions the petitioners called as one of their witnesses J. Frank Walls, of Bedford, Indiana, who was one of the appraisers appointed to make an appraisal of the personal estate of the decedent by the Probate Court of Lawrence County, Indiana. The other appraiser was Ambrose K. Sears, a county assessor and State inheritance-tax appraiser for Lawrence County. Walls testified that he was thoroughly familiar with the Indiana limestone business and with the value of the shares of stock of Indiana limestone companies and of other local securities. He further testified that there had been no sales of the shares of stock of the Ingalls Stone Company; that the stock was closely held; that he was furnished with a copy of an adjusted balance sheet of the Ingalls Stone Company as of October 31, 1928, which balance sheet showed an excess of assets over liabilities of $1,052,078.46, which represented the book value of the preferred and common stock. Knowing the properties of the company as he did, and knowing that certain of the assets were carried at amounts which he knew were in excess of their real values, he and Sears carefully went through the balance sheet and marked down the value of certain of them. The amount of such mark-down was $212,319.69. This amount was then deducted from $1,052,078.46, referred to above, which left a balance of $839,-758.77 as the equity of the common and preferred stockholders in the assets of the company. From the last named amount there was then deducted $268,400 as the equity of the preferred stockholders, which left a balance of $571,358.77 as the equity of the common shareholders. This last named amount was then divided by 3,707 shares of common stock outstanding, which gave a value for the common shares of $154.13. Although the equity attributable to the preferred stock was in the computation shown as $100, the preferred stock was returned for inheritance-tax purposes at a value of $75 per share and the common at $154.10 per share. These are the same values shown on the Federal estate-tax return.

Another witness for the petitioners was C. H. Burke, who was the secretary of the Maynard H. Murch Company, of Cleveland, which, in 1924, had underwritten an issue of bonds of the Ingalls Stone Company of $300,000. Burke testified that in his opinion and in the opinion of his firm the Indiana limestone industry was a hazardous one. There were many competitors. Before his firm would

underwrite the issue of bonds it required that the Ingalls Stone Company take out a life insurance policy on the life of Charles C. Ingalls in the amount of $300,000. The firm considered Ingalls to be a very exceptional man in the stone industry—a man who would make a business succeed where others would fail. They placed much reliance upon the management and were desirous of securing themselves and their clients who might be purchasers of the bonds against the untimely death of Ingalls. He testified that Ingalls had lived up to their expectations and had succeeded in making the company a success; that shortly prior to the death of the decedent the Indiana Limestone Company had been formed, which had taken in some 24 independents which had operated with indifferent success; that in 1928 this combine dominated the field, and that the price structure was dictated by this concern. He further testified, as a banker thoroughly familiar with the industry and the situation which existed with respect to it in 1928, that he considered a fair method of valuing the total shares of stock of the Ingalls Stone Company in 1928 would have been to capitalize the earnings of the company for a five-year period ending in 1928 upon a six-year basis. He testified " My idea of the value of that business was $662,059.62 as of October 24, 1928, without taking into consideration the elimination of Charles C. Ingalls, who was the dominating factor in making the company a success." This amount is much less than the value returned for decedent's holdings in the estate-tax return. He further testified that he was not interested in allocating this value between the common and preferred shares; that inasmuch as Ingalls owned more than 85 per cent of each class of stock his holdings would carry the control of the company.

A third witness was W. E. Clark, one of the executors of the estate. He testified as to the remarkable ability of Charles C. Ingalls and as to the conditions which obtained in the Indiana limestone industry in 1928. In his opinion the preferred and common stock of the Ingalls Stone Company could not have been sold in 1928 for as much as it has been returned for estate-tax purposes. He thought that the values returned for both classes of stock were high and that no market could have been found for them in 1928 at those prices.

The taxing statute requires the inclusion in the gross estate of the " value at the time of * * * death " of property of the decedent. Section 302, Revenue Act of 1926. In article 13, Regulations 70 (1929 Edition), it is stated:

The value of all property includable in the gross estate is the fair market value thereof at the time of decedent's death. The fair market value is the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell. * * *

The question of the valuation of property in such a case as the one before us here involves the exercise of sound judgment upon the entire facts of record. In *James Couzens*, 11 B. T. A. 1040, 1160–1169, we exhaustively discussed principles of valuation. A review of those principles in this proceeding would not be profitable. The problem in this case is much the same as was before the court in *Uncasville Manufacturing Co.* v. *Commissioner*, 55 Fed. (2d) 893, wherein the court stated:

* * * but of all things value is the most uncertain. Opinions about it are prophecies, whose truth cannot ordinarily be verified save where the property is in fungibles, and there is a concourse of buyers and sellers. As to property like that at bar the best opinion is little more than a guess. These factories were in the country, situated on streams, dependent in part upon them for power. They had their history, their goodwill, their own individuality; it was a most difficult matter even with disinterested evidence to arrive at their equivalent in money. * * *

We do not know upon what basis the respondent has made his determinations of value. From the stipulated facts it is reasonable to infer that they are predicated in large part upon the balance sheet and earnings over a period of years. It must be admitted that the earnings of the company were large. It is also true that one of the witnesses testified that owing to valuable contracts on the company's books at the date of the decedent's death the earnings for 1929 were in excess of those for 1928. We are of the opinion, however, that the balance sheet is not a reliable index of value and that earnings are only one factor to be considered in valuing the decedent's holdings.

From the evidence of record we can not determine the correctness of the adjusted balance sheet as of October 31, 1928, furnished the witness, Walls. The equity of the common and preferred stockholders in the balance sheet contained in the stipulation of facts as of November 30, 1928, is $1,312,362.93, as contrasted with the adjusted balance sheet furnished Walls of $1,052,078.46. The asset items in that balance sheet which Walls testified were in excess of true values are substantially the same amounts as he stated were included in the adjusted balance sheet furnished him. The markdown in those assets was warranted by the information in the possession of Walls. We are therefore of the opinion that in the valuation of the decedent's holdings Walls and his associate, Sears, were justified in reducing the equity of the common and preferred stockholders in the amount of $212,319.69. This leaves an equity for the common and preferred shareholders at November 30, 1928, of $1,100,043.24. We are of the opinion that the equity of the common and preferred shareholders at the date of the death of the decedent was approximately the same amount.

From a consideration of the entire record, we are of the opinion that the preferred stock had a market value not in excess of $75 per share at the date of the death of the decedent. There were outstanding at that time 2,684 shares of preferred stock, which, multiplied by $75 for each share, gives a total of $201,300 as the value of such stock, and this amount deducted from the $1,100,043.24, referred to above, gives a total of $898,743.24 as the equity of the common stockholders, and this divided by 3,707, the number of shares outstanding at the date of the death of the decedent, gives a value of $242.44 per share. We therefore conclude from the evidence that the fair market value of the preferred shares of the Ingalls Stone Company at the date of the death of the decedent was $75 per share, and of the common shares was $242.44 per share.

Although the amounts thus found are considerably in excess of those estimated by the witness, Burke, the Board is of the opinion that the earnings for the company for the six-year period ended in 1928 warrants such a valuation. The average earnings per common share during such period, after the allowance of dividends upon the average number of preferred shares outstanding during the period, equal $35.54 per share for the common stock, and it is furthermore to be noted that the company had valuable contracts on its books at the date of the death of the decedent, and the testimony shows that the profits for the year 1929 were in excess of those for 1928.

*Judgment will be entered under Rule 50.*