MAY ROGERS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

HORACE S. TUTHILL, JR., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

EDNA MAY THRALL, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 45051, 52448, 52449, 55546. Promulgated January 9, 1935.

*Hugh Satterlee, Esq.,* and *I. Herman Sher, Esq.,* for the petitioners
*Mason B. Leming, Esq.,* for the respondent.

OPINION.

SEAWELL: Petitioners Tuthill and Thrall insist that the stock they acquired from their mother under the provisions of the contract of July 29, 1921, was by way of gift, and the respondent adheres to the conclusion he reached at the time of determining the deficiencies, that the transaction was an outright sale of securities for an annuity. On this theory the respondent limited the cost basis of each kind of stock so acquired to a proportionate part of $5,333.36, the amount paid to Sarah E. Tuthill under the contract prior to her death on December 1, 1921, based upon the values placed on the stocks for estate tax purposes.

If we were bound to look no further than the bare words of the contract there would be reason to find for the respondent, for the instrument contains many earmarks of an outright sale. But we may consider both the form and substance of the transaction in reaching a solution of the problem. *Phelps* v. *Commissioner*, 54 Fed. (2d) 289, affirming 20 B. T. A. 866; certiorari denied, 285 U. S. 558.

In *Albert Russel Erskine*, 26 B. T. A. 147, a written instrument provided that the petitioner should have the "right and option to buy and receive" certain stock at a specified price less than its true market value, but from all the facts we concluded that the agreement was essentially a contract of employment. In the case of *G. Wildy Gibbs*, 28 B. T. A. 18, there was a transfer of property of a value of $412,131.60 encumbered by mortgages in the amount of $215,652.50 in trust, for the sole benefit of the petitioners, with the proviso that the beneficiaries assume the mortgages and pay

their mother, the grantor, $100 per month for her life. The grantor died one year after the transfer. We held that the difference between the actual consideration paid and the fair market value of the property at the time of transfer must be regarded as a gift, and that the basis for computing gain realized on sale of the property by the beneficiaries in 1920 was the fair market value of the property when transferred to the trustee. In so holding we rejected claims of the Commissioner that the transaction was an outright sale and that the basis for determining gain on the sale by the petitioners was the amount of the mortgages, plus the amount actually paid.

Other cases, involving varying facts, are to the same effect. *Harry F. Robertson*, 5 B. T. A. 748; *E. D. Knight*, 28 B. T. A. 188; *Phelps* v. *Commissioner*, supra; *Robinson* v. *Commissioner*, 59 Fed. (2d) 1008.

In the instant case we think there is an abundance of proof that the transaction was improperly classified in the contract. On several occasions during the spring and summer of 1921 Sarah E. Tuthill indicated a desire to give the securities bequeathed to her by her husband, together with the 1,280 shares of common stock of the Sheffield Co. which she had received under the 200 percent stock dividend declared December 31, 1920, to her son and daughter, with the understanding that they pay to her from time to time what she might need for living expenses. Her attorney suggested an annuity of $30,000 per year, but she considered such an amount excessive. After some deliberation she fixed the annuity at $16,000 per year and consented, on the advice of counsel, to execute a written agreement providing, among other things, for the deposit of collateral as security for the payment of the amount in monthly installments.

There is no indication in the record that any of the parties to the transaction considered the fair market value of the stock involved when determining upon the annual payment of $16,000. The transferor was then living at the home of petitioner Thrall and did not need a large sum for living expenses. Apparently in the absence of suggestions of her attorney she would have transferred the stock to her son and daughter without the formality of an agreement. Had the transaction been carried on at arm's length, each party striving for the best possible bargain, the value of the stock would have been inquired into, for it is agreed that an annuity of $16,000 per year could have been purchased by the transferor on July 29, 1921, for $144,634. The stock of the Sheffield Co., Milk Co., and By-Products Co. actually had a fair market value at that time considerably in excess of what the annuity agreed upon would have cost.

We are of the opinion, and so hold, that the difference between the cost to the petitioners and the fair market value of the stock was a gift.

Petitioners Tuthill and Thrall each received by transfer from their mother 960 shares of common stock of the Sheffield Co., 87 shares of common stock of the Milk Co., and 63 and 64 shares, respectively, of common stock of the By-Products Co. and 103 and 104 shares of preferred stock of the Sheffield Co. Of the 1,920 shares of common stock of the Sheffield Co. included in the gift, the transferor acquired 640 shares on September 1, 1919, under the will of her husband, and 1,280 by reason of the stock dividend declared December 31, 1920. She acquired all of the stock of the Milk Co. and By-Products Co. under her husband's will.

The Revenue Act of 1926, which governs the sales made in 1925, provides in section 204 (a) (2) that if property is acquired by gift after December 31, 1920, " * * * the basis shall be the same as it would be in the hands of the donor * * *." The donor's basis was the fair market value of the property on September 1, 1919, the date of her husband's death. Section 204 (a) (5), Revenue Act of 1926; *Brewster* v. *Gage*, 280 U. S. 327; *Gertrude B. May et al., Trustees*, 26 B. T. A. 1413. The stock dividend did not change the amount of the donor's basis, merely the basis per share of stock. The basis per share for common stock of the Sheffield Co. acquired by petitioners Tuthill and Thrall by gift from their mother is one third of its fair market value on September 1, 1919. *Theodore W. Case et al., Trustees*, 26 B. T. A. 1044; *Gertrude B. May et al., Trustees, supra; Frances Elliott Clark*, 28 B. T. A. 1225. The basis for the common stock of the Milk Co. and By-Products Co. is its fair market value on September 1, 1919.

The petitioners alleged in their petitions, maintained at the hearing, and claimed on brief that most of the stocks in question had a fair market value on the basic dates in excess of the amounts used in the returns they filed as coexecutors for estate tax purposes. The value claimed for common stock of the Sheffield Co. as of September 1, 1919, is six times the value reported and determined for estate tax purposes. The respondent contends, *inter alia*, that the petitioners are estopped to deny the correctness of the values used by them in the returns they filed as executors for estate tax purposes, without pointing to any particular kind of estoppel as controlling. We know of none that would deny the petitioners the right to prove by competent evidence that the securities had fair market values on September 1, 1919, and June 22, 1922, different from the values they used as coexecutors for estate tax purposes.

The value of property as of a particular date is a matter of opinion and evidence. Mere expressions of opinion can not be regarded as misrepresentations of fact to work estoppel. *Hurt* v. *Riffle*, 11 Fed. 790; *United States Press Associations* v. *National Newspapers Association*, 254 Fed. 284; *Quirk* v. *United States*, 45 Fed. (2d) 631. No right of election is involved, as in *W. R. Ramsey*, 26 B. T. A. 277; affd., 66 Fed. (2d) 316; certiorari denied, 290 U..S. 673, cited by the respondent. The respondent does not claim to have relied, and did not rely, upon the values reported in the estate tax returns. The liability of the respective estates for estate tax was not determined by the respondent until after his agents had investigated the value of the securities. In the case of the estate of Horace S. Tuthill, Sr., he increased the value of the stock of the By-Products Co., and in determining the net estate of Willis E. Rogers he increased the value of the common stock of the Sheffield Co. Obviously, if these petitioners derived any benefit from such course of action it was due, in the final analysis, to errors of judgment on the part of the respondent rather than the executors of the respective estates. The courts have held that an act done in a representative capacity will not estop one in his individual capacity, and vice versa. *Rohn* v. *Rohn*, 204 Ill. 184; 68 N. E. 369; *Simpson* v. *People's Ice Mfg. Co.*, 44 La. Ann. 612; 10 So. 814; *Chapman* v. *Gates*, 54 N. Y. 132; *Micon* v. *Lamar*, 1 Fed. 14; *Morton* v. *Preston*, 18 Mich. 60; *White* v. *Roper*, 167 S. E. (Ga.) 177.

Aside from these considerations the answers of the respondent allege no facts on the question, as required by Rule 14 of the Board's rules of practice. Beyond statements made by his counsel at the hearing, he has not raised the issue. As to the necessity of pleading estoppel as a defense, see *Philadelphia, Wilmington & Baltimore Railroad Co.* v. *Howard*, 54 U. S. 307; *In re Stoddard Bros. Lumber Co.*, 169 Fed. 190; *Grouf* v. *State National Bank of St. Louis*, 40 Fed. (2d) 2; *Bamberg Cotton Mills Co.*, 8 B. T. A. 1236; *Package Machinery Co.*, 28 B. T. A. 980; *Duesenberg, Inc. of Delaware*, 31 B. T. A. 922.

The petitioners contend that the fair market value of the common stock of the Sheffield Co. on September 1, 1919, and June 22, 1922, was not less than $914.61 and $304.87 per share, respectively. They ask us to give no weight to the values currently made by them as coexecutors for estate tax purposes and sales of the stock at or near the basic dates. The sales, they urge, were insignificant in volume and insufficient to establish fair market value. They argue further that, under the circumstances, it is both proper and essential that the stock be valued by a resort to the assets behind it.

It is claimed that fair market value of the net tangible property of the corporation attributable to each share of common stock was

$595.74 on September 1, 1919, and $226.17 on June 22, 1922. Proof of the value of the tangible assets of the corporation on the various dates is limited to an appraisal made in 1919 by the Keystone Appraisal Co. By reason of this appraisal, the assets were written up on the books in December 1920 in the amount of $2,549,250. The appraisal seems to have been made primarily for insurance purposes. The property was valued on the basis of reproduction costs, less depreciation and obsolescence. Appraisals made on such a basis are entitled to little weight in the determination of fair market value. *American Steel Wool Manufacturing Co.*, 14 B. T. A. 762; *A. M. Byers Co.*, 19 B. T. A. 660; *National Packing Corporation*, 24 B. T. A. 952; *Clinton Cotton Mills, Inc.*, 28 B. T. A. 1312.

Two methods are employed by the petitioners to value good will. Their first method, which they seem to regard as the more accurate, is based upon the number of quarts of milk sold daily during several periods. Using $20 as the value for each quart of milk sold, the petitioners claim good will values on September 1, 1919, of from $5,313,820 to $5,632,580, depending upon whether sales on the basic date, average daily sales during the first or last six months of the year preceding the basic date, or the average daily sales during the year preceding the basic date, are used. By the same computation they reach good will values on June 22, 1922, of from $7,129,720 to $7,403,420. On the basis of the valuations so found most favorable to them, the petitioners contend that the corporation's good will had a value, per share, of $423.56 on September 1, 1919, and $185.08 on June 22, 1922. Their other method of valuing good will consists of allowing 6 percent as a reasonable return on tangible assets and capitalizing the excess at 10 percent. In computing a valuation as of September 1, 1919, they use earnings over four periods ranging from 20 months to six years immediately preceding the basic date. They regard the 20-month period as being in accordance with the formula approved in A. R. M. 34, 2 C. B. 31. Using the 20-month period as a basis, a good will value on September 1, 1919, of $467.97 per share, or $44.41 in excess of the valuation reached by the first method, is obtained, this valuation being in excess of amounts arrived at on the basis of the other periods. To obtain a value as of June 22, 1922, they use earnings over a period of four and one half years. Such calculations produce a good will value on June 22, 1922, of $83.38 per share, an amount considerably less than the values determined by the first method.

The petitioners contend that the values fixed for the stock by the methods just described are fully supported by expert testimony. The opinions of the expert witnesses are based almost entirely upon the assumption that the tangible assets had a fair market value equal to

book value. " The capital stock of a corporation, its net assets, and its share of stock are entirely different things. * * * The value of one bears no fixed or necessary relation to the other." *Ray Consolidated Copper Co.* v. *United States*, 268 U. S. 373. Expert testimony must be viewed in the light of other facts established by the evidence. *Balaban & Katz Corporation* v. *Commissioner*, 30 Fed. (2d) 807; *Anchor Co.* v. *Commissioner*, 42 Fed. (2d) 99; *Uncasville Manufacturing Co.* v. *Commissioner*, 55 Fed. (2d) 893; *Tracy* v. *Commissioner*, 53 Fed. (2d) 575; *James Couzens*, 11 B. T. A. 1040; *Tex-Penn Oil Co.*, 28 B. T. A. 917.

The petitioners attempt to analyze the sale made in 1925 to the National Dairy Products Corporation to show the amounts paid respectively for tangible assets and good will, with the view of showing the reasonableness of their computations of value as of prior dates. There is nothing of record to show the manner by which the attorneys in fact, representing the stockholders of the Sheffield Co., and the buyer determined the selling price of $500 per share. The vendors made certain representations to the buyer respecting the net worth of the corporation at the close of the years 1922, 1923, and 1924, and its net profits during the first six months of 1925. These representations the buyer verified by an audit of the books of the Sheffield Co. It does not appear that the buyer ever made an appraisal of the tangible or intangible assets of the Sheffield Co.

The values at which the stock was returned for estate tax purposes are not controlling. *Kate I. Nixon*, 2 B. T. A. 524; *R. B. Cook*, 3 B. T. A. 668; *Elizabeth J. Bray, Administratrix*, 4 B. T. A. 42; *David Williams*, 15 B. T. A. 227; *Edgar M. Carnrick*, 21 B. T. A. 12; *Lillian G. McEwan*, 26 B. T. A. 726. See *Sterling Newell et al., Executors*, 25 B. T. A. 773; reversed, 66 Fed. (2d) 102. They represent, however, values currently arrived at and are entitled to weight in determining the fair market value of the securities in the light of all of the facts present here.

The record contains evidence of sales of the stock on or about September 1, 1919, at prices from $140 to $235 per share. The volume of the sales was not sufficient to establish a fair market value. The New York State transfer tax return filed for the estate of Willis E. Rogers shows four sales of the stock from May to October 1921, one of 100 shares, at from $100 to $105 per share.

The reasonableness of the rule that fair market value of stock may not be determined by any prescribed standard of measurement, but must result from due consideration to all the facts and relevant evidence, is well illustrated by the facts and claims being made here. They point to values ranging from $140 to in excess of $1,000 per share as of September 1, 1919, the higher amount being based alone on corporate assets of the value claimed by the petitioners.

From a careful consideration of the history of the Sheffield Co., its earning power, sales made of its stock, and all other facts of record, giving to each factor the weight we think it is entitled to, we have determined that the common stock of the Sheffield Co. had a fair market value of $344 per share on September 1, 1919, and $120 per share on June 22, 1922.

The petitioners are claiming that the common stock of the Milk Co. had a fair market value of $100 per share on September 1, 1919, and June 22, 1922. The respondent determined fair market values on such dates of $30 and $50 per share, respectively. These figures agree with values determined by the executors of the estates of Horace S. Tuthill, Sr., and Willis E. Rogers, and the respondent for estate tax purposes. No evidence was offered on the value of the assets behind the stock. Except in 1919 and 1921 the corporation had no net income available for the payment of dividends on common stock. Evidence in the record of sales of, and quotations on, the stock at or about the basic dates supports the determination of the respondent. The valuations placed on the stock by the respondent will not be disturbed.

The common stock of the By-Products Co. was returned by petitioners Tuthill and Thrall as coexecutors of their father's estate at no value. The respondent determined that it had a value of $30 per share as of September 1, 1919. Petitioners Tuthill and Thrall claimed in their income tax returns for 1925 and contend here that the stock had a fair market value on March 1, 1913, and September 1, 1919, of $100 per share for the purpose of computing gain or loss on the sale of the securities to the National Dairy Products Corporation. The respondent determined a fair market value of $30 per share on each date.

The book figures in evidence do not cover any period prior to 1914 or after the close of 1918, and no evidence was offered as to the value of the assets behind the stock in and prior to 1918. Affidavits of appraisers of the stock for New York State transfer tax purposes show that at about September 1, 1919, the current assets were only about $9,000 in excess of liabilities, with $260,700 par value of preferred stock outstanding. There was a sale of an undisclosed number of shares of the stock shortly before September 1, 1919, at $30 per share. The respondent's valuations of $30 per share for this stock on March 1, 1913, and September 1, 1919, will not be disturbed.

Petitioner Thrall sold her holdings of preferred stock of the Sheffield Co. in 1928 and the amount of gain or loss sustained on the sale is governed by the Revenue Act of 1928. Of the 166 shares of stock she sold, she acquired 5, 5, and 10 shares on December 21, 1914, December 20, 1915, and January 26, 1917, respectively, by way of gift from her father. These shares having been acquired by gift prior to December 31, 1920, their basis is a fair market value at the

time of acquisition. Section 113 (a) (4). She acquired 42 shares under the will of her father. The basis for these shares is the fair market value on November 20, 1920, the date of distribution to her, having acquired the stock not by specific bequest, but as a residuary legatee. Section 113 (a) (5); *First National Bank of Birmingham*, 31 B. T. A. 847. Petitioner Thrall acquired the remaining 104 shares on July 29, 1921, by gift from her mother. Of the 207 shares the donor transferred to petitioners Tuthill and Thrall, she acquired 120 shares prior to March 1, 1913, and 82 shares on November 20, 1920, as a residuary legatee of her husband's will. Section 113 (a) (2) of the Revenue Act of 1928 provides that if property was acquired by gift after December 31, 1920, the basis " shall be the same as it would be in the hands of the donor  *  *  *." The donor's basis for the 120 shares she acquired prior to March 1, 1913, was cost or fair market value on March 1, 1913, whichever is greater. Section 113 (b). Her basis for the 82 shares she acquired under the will of her husband was their fair market value on November 20, 1920. Sec. 113 (a) (5).

Petitioner Thrall claims that the fair market value of the preferred stock on the various basic dates was " close to $100 " per share. In his computation of the gain realized in the transaction, the respondent determined that the stock acquired by gift on December 21, 1914, December 20, 1915, and January 26, 1917, had a fair market value on such dates of $95, $100, and $94, respectively, per share. Such determinations are approved in the absence of proof of higher fair market values. For the 42 shares she acquired from her father's estate, the respondent determined a fair market value of $85 per share, the value used by him and the executors of the estate of Horace S. Tuthill, Sr., for estate tax purposes. Such evidence as there is in the record respecting the fair market value of the stock on September 1, 1919, supports, rather than overcomes, the presumptive correctness of the respondent's finding of value. Accordingly, it will not be disturbed.

The record does not disclose the source of the specific 104 shares of stock Sarah E. Tuthill gave to petitioner Thrall on July 29, 1921. The respondent did not determine the fair market value of the stock as of March 1, 1913, or November 20, 1920. The proof is that the stock had a fair market value on November 20, 1920, of $80 per share, and from the evidence we can not see that the stock was worth a greater amount on March 1, 1913. The gain realized on the sale of the 104 shares will be computed on the basis of a fair market value of $80 per share.

Reviewed by the Board.

*Decision will be entered under Rule 50.*