Estate of Edgar F. Luckenbach, Deceased, Roscoe H. Hupper, Executor v. Commissioner.
Estate of Luckenbach v. Commissioner
Docket No. 16997.
United States Tax Court
T.C. Memo 1958-38; 1958 Tax Ct. Memo LEXIS 192; 17 T.C.M. (CCH) 167; T.C.M. (RIA) 58038; March 7, 1958
*192 George E. Cleary, Esq., 52 Wall Street, New York, N. Y., for the petitioner. William A. Schmitt, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined a $10,940,964.09 deficiency in petitioner's estate tax. The issue is the fair market value on April 26, 1944 of 52,282 1/2 shares of Luckenbach Steamship Company, Inc., stock. Certain expenses of petitioner were not ascertainable at the time of the trial and will be disposed of under Rules 50 and 51. Other issues were settled by stipulation. Findings of Fact Some of the facts were stipulated and are found accordingly. Edgar F. Luckenbach, hereafter called decedent, died April 26, 1943, a resident of Nassau County, New York. Roscoe H. Hupper, the executor under decedent's will, duly filed an estate tax return with the collector of internal revenue for the first district of New York, dated October 26, 1944, showing taxes due of $64,021.48. He elected under section 811(j), Internal Revenue Code of 1939, to use the optional valuation date. By a rider attached to the estate tax return, the executor stated that the value of decedent's interest in 52,282 1/2 shares *193 of common stock of Luckenbach Steamship Company, Inc., hereafter called Steamship, could not be fixed or estimated pending the conclusion of litigation then pending in the Surrogate's Court of New York, requiring decedent to account for trusts under the will of his father, Lewis Luckenbach, who died on August 18, 1906. This stock has always been closely held and has never been listed on any stock exchange. Respondent determined the value of decedent's interest in the Steamship stock to be $15,023,615.92, which amount allegedly represented the full adjusted net worth of Steamship as of the optional valuation date. This determination did not take into account the Lewis Luckenbach trust estate accounting litigation. Prior to 1906, Lewis Luckenbach engaged in joint venturing with certain tugs, coal barges and other floating property including letting of steamships for hire under charter, in which vessels and property he, his brother, Edward, and decedent owned varying fractional interests. Edward died in 1904 leaving his fractional interest in the floating property to his wife and their two children. Lewis suffered a stroke in 1902 and from that date on the operations were under decedent's *194 sole control. By his will Lewis left his residuary estate in trust to pay from income $15,000 annually to his wife, Mary E. Luckenbach, for life and to pay the balance of income to decedent for life. Lewis' widow died on January 24, 1926. Lewis' will provided that upon decedent's death the trust created by his will should be paid over to decedent's lawful issue. Article Sixth of Lewis' will in substance authorized his executors and trustees to carry on and continue his business of transportation of freight, wrecking and towing during the lifetime of decedent or as long after Lewis' death as decedent might desire to continue the business. Decedent was survived at his death by three children, Lewis, hereafter called Lewis, Jr., Andrea, and Edgar F. Luckenbach, Jr., then ages 44, 23 18, respectively. Differences had developed between decedent and Lewis, Jr., who by a trust agreement in 1936, and by an assignment in 1943 transferred all his right, title and interest in his grandfather's trust estate to three trustees. By will decedent left 2/3 of his residuary estate to his son, Edgar F., Jr., to be held in trust until age 26, and 1/3 of his residuary estate to his daughter, Andrea, *195 to be held in trust until age 31. His will left a total of $5,000 to Lewis, Jr. Upon decedent's death, the trustees and assignees of Lewis, Jr., became entitled to 1/3 of the grandfather's trust estate and to none of decedent's residuary estate; Andrea became entitled to 1/3 of her grandfather's trust estate and 1/3 of decedent's residuary estate; and Edgar F., Jr., became entitled to 1/3 of his grandfather's trust estate and 2/3 of decedent's residuary estate. As of April 3, 1908, the fractional shares in floating property of the estate of decedent's father amounted to $380,147.47. Decedent received this property as trustee and he held it as such from April 3, 1908 until his death. For a few years decedent continued operations under his own name, but new and larger vessels were added, paid for out of his income or capital or money belonging to the Lewis Luckenbach estate or Edward Luckenbach's heirs proportionately to their interest in the floating property. As floating equipment was lost or disposed of, the realized proceeds, together with income belonging to decedent, were invested in new vessels or other floating equipment. On January 10, 1913, decedent organized Steamship, *196 a Delaware corporation, with an original capital of $10,000, all contributed by decedent. Steamship thereafter managed the operations of the vessels which continued up to 1918 to be owned in fractional shares by individuals and trustees. When the Panama Canal opened in 1914, Steamship used the adaptable floating equipment to carry cargo to and from the west coast. Steamship, at this time, acquired no ownership of floating equipment but transitorily operated the vessels, tugs and barges owned in fractional shares by individual owners. In 1915, decedent formed Luckenbach Company, Inc., which contracted to build three new 10,000-ton steamships. The stock of this corporation was owned partly by decedent and partly by the heirs of Edward, but the latter's stock interests were later liquidated upon the receipt by them of certain fractional interests in vessels. In August 1918, Luckenbach Company, Inc., merged into Steamship. The fractional interests in floating equipment owned by decedent and the Lewis Luckenbach trust, including decedent's undrawn income, were transferred to Steamship. Its authorized stock was increased to $25 million of which 52,282 1/2 shares of $100 par value each, *197 the total issued and outstanding stock, were issued to decedent. All of these share were placed in the name of "Roscoe H. Hupper, as Trustee for Edgar F. Luckenbach" in March 1943 and he, after qualifying as executor of decedent, has continuously held all of these shares as registered in his name on the books of Steamship. In 1926, Steamship made a purchase settlement with Edward's heirs covering all fractional vessel interests owned by them. From the date of decedent's mother's death until his death only he and his father's estate had an interest in Steamship or its assets. Decedent filed an accounting of the Lewis Luckenbach trust in the New York Surrogate's Court in 1939, pursuant to an application made in 1938. Objections to this accounting were filed on behalf of decedent's daughter, Andrea, and by the trustees of the trust to which his son, Lewis, Jr., had transferred his interest. Late in 1939, a more detailed amended accounting was filed which showed the fractional interests in steamers, tugs and barges in the amount of $380,147.47 which constituted the trust at its inception in 1908. This accounting also showed the disposition of these property interests, the reinvestment *198 of part thereof in vessels later sold, and the fractional interests of the Lewis Luckenbach trust in 9 vessels which together with other vessels were being operated in intercoastal trade by Steamship, which fractional interests had a cost of $2,229,176.22. Objections were again filed based primarily on the ground that the trust estate consisted not merely of the physical assets which were in existence in 1908, but of a business formerly carried on by decedent's father which included intangible as well as tangible assets. This matter was referred to a referee on March 1, 1940. After the taking of testimony, the contestants united in a motion for an order directing the trustee to file an account of the operations and transactions of the going business received and conducted by the trustee under the provisions of the will of Lewis, including the full statement of all receipts and disbursements, and requesting detailed information as to the operation of the going business. Prior to decedent's death, an oral contention was made on behalf of Lewis, Jr., and Andrea, that the remaindermen were entitled to a considerable portion of the stock of Steamship, and this claim went as high as about *199 97 per cent of the stock. The referee denied the contestants' motion on December 24, 1941 and held that the business as carried on by the decedent was not the same business as was carried on by the testator, Lewis, or the continuation thereof, and that in 1908 the trustee took over fractional interests in certain specific vessels rather than a going business. The trustee was held chargeable only with the physical assets received by him from the executors, as shown in the 1908 decree settling the accounts, together with all increments derived therefrom by reason of proceeds from insurance collected or from the sales prices of the assets. On March 27, 1942, a motion to reject the referee's report was heard and decision on this motion was reserved, conferences being suggested in order to reach an amicable adjustment. On June 28, 1943, the surrogate rendered his decision on the motion and held: "(1) The business conducted by the deceased trustee, directly or indirectly, by corporations, the stock in which was issued in his name or that of his nominees or otherwise controlled by him, is the same business conducted by the testator, Lewis Luckenbach, at the time of his death or the *200 natural out-growth or development thereof and which testator directed to be held in trust by Paragraph 'Sixth' of his will. "(2) The deceased trustee was accountable for such business and his legal representative must presently account for the same to the date of the death of the deceased trustee. "(3) The legal representative of the deceased trustee must account for the income of the trust including such business in order to determine whether the deceased trustee is accountable for any amounts withdrawn from such business in excess of the true income thereof or whether there is any income not received by him to which his estate is presently legally entitled. "(4) The Court cannot presently determine whether or not the trust or the remaindermen thereof are entitled to elect to participate in the benefits, if any, in the purchase by the deceased trustee of the interest of the estate of Edward Luckenbach, nor can it presently determine the extent of the interest of the trust estate in the floating equipment or whether the entire business was the property of the trust or, if not, the extent of the interest of the trust estate in said business and the floating equipment. Such questions *201 are expressly reserved for future determination. [1]" This decision was put into effect by a decree dated July 6, 1943. On May 13, 1943, the surrogate had decided on the appointment of a successor trustee and in an opinion dated June 14, 1943, had refused to stay the appointment of the successor trustee pending the determination of an appeal by decedent's executor and Edgar F., Jr. The successor trustee made a motion to require decedent's executor to turn over all of the Steamship stock and that a new certificate be issued to him as successor trustee to enable him to control the operations of the company. The appellate division of the New York Supreme Court stayed action on this motion and on December 29, 1943 the order appointing the successor trustee was reversed by that Court. The contestants to the accounting appealed from this decision, which appeal was argued and pending for decision in the New York Court of Appeals on April 26, 1944. The decision of the appellate division was affirmed on May 18, 1944. On April 13, 1946, decedent's executor filed a further accounting covering the period from April 3, 1908 to *202 December 31, 1942 and showing that on the latter date the Lewis Luckenbach trust consisted of varying fractional interests in 10 vessels at a cost of $1,960,088.20, plus uninvested proceeds of $702,318.67, or a total of $2,662,406.87. On May 22, 1946, a supplement to this accounting was filed, carrying it down to the date of decedent's death. Objections to these accountings were filed by decedent's son, Lewis, Jr., his assignees and trustees, and Andrea, and the matter was again referred to a referee. The contestants claimed that the remaindermen were entitled to 58.46 per cent of the Steamship stock. However, on August 10, 1950, the referee rejected this contention and confirmed the accountings as filed by the executor with an amendment agreed to by the executor for addition of $157,724.19, which amount increased the total of the trust to $2,820,131.06. A decree based on the referee's findings was rendered on December 14, 1950. The contestants appealed to the appellate division of the New York Supreme Court on several occasions and also to the New York Court of Appeals, only to have the decree affirmed by both courts. On July 30, 1953, decedent's executor filed an account which *203 carried the accounting of the Lewis Luckenbach trust from the date of decedent's death to July 30, 1953. Objections were filed to this account but were later compromised and withdrawn. On May 4, 1955, decedent's executor filed an affidavit to bring his account to date. On May 27, 1955, a decree was rendered by the Surrogate's Court charging the executor with $4,442,967.76. The portion of this amount which represented the corpus of the Lewis Luckenbach trust on April 26, 1944 was $3,860,717.19. In 1918, Steamship owned a substantial fleet of recently built cargo vessels and engaged primarily in operating them in the intercoastal trade between the east and west coasts of the United States through the Panama Canal. It also chartered vessels to Luckenbach Gulf Steamshipcompany, an affiliated corporation, for operation between North Atlantic and Gulf ports, and from time to time chartered some of its vessels to others, also occasionally chartering vessels from other owners. It was one of the major operators in the United States intercoastal trade. The selling values of vessels and the chartering rates rose in August 1939 when the demand for shipping increased. Steamship continued its *204 regular intercoastal business but used or chartered out some of its vessels in foreign trade to other ship operators, including the British Government which chartered vessels to carry supplies to the Red Sea to meet the war emergency in Egypt. An approximate classification of its business voyages for 1941 is: Voyages
Intercoastal service
88
Chartered to Luckenbach Gulf
Steamship Company
47
Chartered to British Govern-
ment for Red Sea
12
Chartered to others
7
Chartered to the Orient
6 Engagement in these various activities cut down the usual extent of intercoastal service. In 1941, Steamship had time charters with rates as high as $7.50 per dead weight ton per month, and the Red Sea charters in 1941 produced about $6.37 per dead weight ton per month. Thereafter the charter rates and values of vessels were reduced. On November 26, 1943, Steamship was notified by the Maritime Commission of its intention to renegotiate the Red Sea charters. On January 13, 1950, the chairman of that Commission determined that Steamship had derived excessive profits of $1,438,801.36 of which amount allocations of $1,172,753.88, $65,049, and $75,000 were made to 1941, 1942 *205 and 1944, respectively, for the purpose of determining the applicable credit for Federal income and excess profits taxes. Steamship petitioned the Tax Court for a redetermination and this case is still pending. The net amount of income after taxes involved is $302,524.93 for 1941, $12,359.31 for 1942 and $10,875 for 1944. Both petitioner and respondent included these amounts in their computation of Steamship's net income. The United States Government recaptured the amounts in dispute and is presently holding these funds subject to the decision of the Tax Court. On December 7, 1941, Steamship owned 23 freight vessels ranging from about 8,000 to 14,000 dead weight tons with speeds of 10.5 to 13.1 knots per hour. Five of these vessels were built between 1910 and 1918 and the others between 1918 and 1920. One of these vessels was lost on January 29, 1942 and the remaining 22 were requisitioned for use by the War Shipping Administration, henceforth called W.S.A., such requisitions becoming effective on various dates from January 8 to June 3, 1942. Some months after this requisition Steamship entered into time charters with the W.S.A. fixing the time charter hire and agreeing on valuations *206 in the event of loss. The time charter rates agreed to by it used a basic rate of $4.00 per dead weight ton per month which with speed differentials gave an average time charter rate of about $4.20 per dead weight ton per month. Initially, the time charter hire was currently paid. However, questions later arose as to what speed premiums should be allowed, and an additional question arose as to whether the time charter hire rates agreed to by the W.S.A. were more than proper under the law. Thereafter Steamship received from time to time anywhere from 75 per cent to 50 per cent of the agreed charter hire. Current payment of the agreed time charter hire was not restored until 1944, and it was not until 1945 that Steamship was assured of being paid on the agreed basis. The time charter hire payable to Steamship was subject to renegotiation and on January 13, 1950 a determination was made that $800,000 represented the portion of its profits derived from contracts and subcontracts subject to renegotiation for the year ending December 31, 1943, which was claimed to be excessive. Steamship petitioned the Tax Court and this matter is still pending. The net amount of 1943 income involved *207 after credit for taxes is $194,432. Both petitioner and respondent include this amount in Steamship's 1943 income. The Government has collected this net amount from Steamship and is presently holding it subject to the decision of the Tax Court. In November 1943, the W.S.A. proposed to reduce the time charter rates applicable to requisitioned vessels. Steamship refused to agree to this reduction in its time charter rates, whereupon the Government requisitioned all of the remaining vessels for use on a bareboat basis effective at various dates from December 10, 1943 to July 4, 1944. Under a bareboat charter, the owner has no obligation to furnish crews for the vessel. The W.S.A. offered to pay bareboat charter hire at a basic rate of $1.25 per dead weight ton. Steamship refused to accept this proposal and relied on just compensation. Payments of bareboat charter hire were made for a time on the basis of 75 per cent of the amount offered by the W.S.A. In May 1946, the Government owed Steamship bareboat charter hire of some $4,600,000. After the requisition of Steamship's vessels in 1942, it could no longer function as a common carrier but acted only as the charter agent in operating *208 its own ships for the Government. It secured the crews and supplied and maintained the ships. However, it did not secure any cargo. For these services, Steamship received certain commissions and allowances. There was a recapture clause in the agency agreement under which for the years 1942 and 1943, 75 per cent of Steamship's proceeds from its agency services was subject to recapture, and for 1944 and 1945, 90 per cent of these proceeds was subject to recapture. Under these recapture provisions, Steamship repaid the Government $351,643.49, $857,125.16, $381,930.92, and $231,883.23 for the years 1942 through 1945, respectively. Both petitioner and respondent reflect the effects of the recapture provisions in their computation of Steamship's income. The net income of Luckenbach Steamship Company, Inc., as determined by petitioner and respondent, for the years 1934 through 1943 is: As determined by petitioner
Excluding
Including
capital gains
Capital gains or
capital gains
Year
or (losses)
(losses) on vessels
or (losses)
1934
[1,317,889)
[1,317,889)
1935
(264,524)
$ (262,384)
(526,908)
1936
306,839
306,839
1937
(17,845)
(17,845)
1938
257,249
257,249
1939
323,388
490,938
814,326
1940
1,099,246
1,099,246
1941
2,156,213
2,156,213
1942
1,068,097
2,867,680
3,935,777
1943
1,165,695
3,496,028
4,661,723
10-year average: 1934-1943
477,647
1,136,873
5-year average: 1939-1943
1,162,528
2,533,457
3-year average: 1941-1943
1,463,335
3,584,571
1 year: 1943
1,165,695
4,661,723
*209 As determined by respondent
Excluding
Including
capital gains
Capital gains or
capital gains
Year
or (losses)
(losses) on vessels
or (losses)
1934
[1,285,529)
[1,285,529)
1935
(233,624)
$ (262,384)
(496,008)
1936
350,460
350,460
1937
124,456
124,456
1938
252,016
252,016
1939
330,090
487,983
818,073
1940
1,088,125
1,088,125
1941
2,200,575
2,200,575
1942
1,269,833
2,867,684
4,137,517
1943
1,398,237
3,496,028
4,894,265
10-year average: 1934-1943
549,464
1,208,395
5-year average: 1939-1943
1,257,372
2,627,711
3-year average: 1941-1943
1,622,882
3,744,119
1 year: 1943
1,398,237
4,894,265
Steamship had substantial net income in 1918 through 1920. From 1921 through 1939 its operations, after excluding capital gains, abnormal items and taxes, showed a net loss of $5,698,190.05, or an average of $299,904.74 per year, according to petitioner's income computations. Respondent's computations for the same period show a total loss of $5,409,855.72, or an average of $284,729.25 per year. From 1946 through 1954, Steamship had a net loss after taxes and after excluding capital gains of $1,111,711.69, *210 or an average annual loss of $123,523.52. On April 26, 1944, Steamship owned 14 freight vessels with total dead weight tonnage of 158,347. These vessels were from 24 to 31 years old, all of them being under requisition of the W.S.A. and being under, or about to change to, a bareboat status, with no agreement as to the bareboat charter hire or values in the event of loss or requisition for title. At that time, Steamship did not know when it would recover possession and control of its vessels, nor how many vessels would be returned to it or their condition when released. The net book value of Steamship on December 31, 1943 was $12,203,663.53. It had current assets of $10,526,150.92 and vessel replacement fund assets, consisting of cash and insurance receivables, of $9,418,853.00. Its current liabilities amounted to $7,344,097.71 and it had Federal taxes payable from replacement fund assets amounting to $2,117,389.41. Its total liabilities were $10,796,699.67. In addition its vessels were carried at a valuation of $1,333,804.65 which is a valuation of approximately $8.08 per dead weight ton. Of the 14 vessels owned by Steamship on April 26, 1944, the titles of 5 were requisitioned *211 by the W.S.A. in the years 1944 through 1946 for an average price, after taxes, of $41.76 per dead weight ton, and the remaining 9 were sold in the years 1946 through 1951 for an average price, after taxes, of $24.26 per dead weight ton. On the basis of reconstruction cost less depreciation, Steamship had vessels totaling 158,347 tons worth approximately $68.68 per dead weight ton on April 26, 1944. During the year in issue there were 6 companies which derived most of their revenues from coastwise and intercoastal operations and which had common stock traded on an exchange. The price-earnings multiples of these companies were: Based on: 10-year
5-year
3-year
average
average
average
1-year
earnings
earnings
earnings
earnings
(1934-1943)
(1939-1943)
(1941-1943)
(1943)
Excluding capital gains on fixed
assets
American-Hawaiian Steamship
12.36
7.26
6.89
11.23
Company
Atlantic Gulf and West Indies Steamship Linesa
19.74
11.36
7.79
8.16
Eastern Steamship Lines, Inc.a
16.43
10.01
7.25
Inter-Island Steam Navigation 15.63
15.83
14.25
13.18
Co., Ltd.
Matson Navigation Company
19.90
16.01
14.98
15.43
Merchants & Miners Transportation
43.75
159.56
84.77
14.90
Co.
Average b
16.91
13.38
10.78
11.69
Including capital gains on fixed
assets
American-Hawaiian Steamship
10.90
6.29
6.80
11.15
Company
Atlantic Gulf and West Indies Steamship Linesa
10.49
5.64
3.68
4.11
Eastern Steamship Lines, Inc.a
10.78
6.53
7.25
Inter-Island Steam Navigation 15.23
14.86
13.03
12.56
Co., Ltd.
Matson Navigation Company
14.61
10.29
9.03
13.75
Merchants & Miners Transportation
13.91
9.58
5.70
12.56
Co. Average
13.03
9.57
7.46
10.23
*212 The company which was most comparable to Steamship was American-Hawaiian Steamship Company, hereafter called American-Hawaiian, which, along with Steamship, had been a principal common carrier operating in United States intercoastal trade. It and Steamship had vessels of like and comparable types and from 1939 through 1944 they were faced with similar conditions, complications and problems. On December 31, 1939, American-Hawaiian owned 39 freight vessels with a dead weight tonnage of 408,225. By December 31, 1943, its fleet had been reduced to 16 vessels with a dead weight tonnage of 170,365. Its published balance sheet on the latter date showed: Capital stock and surplus
$11,335,115
Reserve for vessel replacements
8,041,336
Reserve for insurance
1,150,000
Total net book value
$20,526,451 It was a self-insurer against marine risks and continued its insurance reserve on December 31, 1943, although under bareboat requisition all insurance risks were assumed by *213 the W.S.A. Its assets were conservatively stated on its books and on December 31, 1943 its vessels, less reserve for depreciation, were carried at $336,785 which is approximately $1.92 per dead weight ton. American-Hawaiian's adjusted income for the 5-year period of 1939 through 1943 was $8,932,521. Its stock was listed and actively traded in on the New York stock exchange from 1939 through 1944 and had an average price on April 26, 1944 of $34 per share. The market value of all of its stock on this date was $14,133,000. The shares of Steamship stock had a fair market value of $175 per share on April 26, 1944 totaling $9,149,437.50 for the 52,282 1/2 shares then issued and outstanding. Opinion The foregoing ultimate finding of fact disposes of the only issue. No controversy remains between the parties except as to the value on the optional valuation date of the Luckenbach Steamship Company stock owned by decedent on the date of his death. A difficulty of this proceeding at the outset is that the parties have not sharply defined nor agreed upon the issue. While the question litigated is said to be the fair market value of the 52,282 1/2 shares of Luckenbach stock owned by *214 the estate, petitioner phrases it that it is the value of "decedent's interest in" these shares, while at the same time contending that the "question here" is "of stock values." The suggestion is on the one hand that the Luckenbach Company did not own all its assets free and clear, and on the other that decedent did not have clear title to all 52,282 1/2 shares of the stock. Of course the two are quite different, [2] and we begin by recognizing that all 52,282 1/2 shares were listed as an asset of the estate, and that the same statement is repeated in the petition herein. It may be of course that the contesting parties might have made good a claim against the estate in some amount, as in fact they did. It is not clear whether this was claimed as a deduction in computing the net estate but it is not here in controversy as such. *215 But it seems to us the stock must be valued on a per share approach and if the estate did not own all of it, in the end, only its part would have been in the estate. The litigation, accordingly, might be effective to diminish the value on the valuation date of each share, but that would be so depending upon its effect upon the property and operations of the Company and not based upon the ultimate determination of who finally succeeded in his claim to ownership of specific numbers of shares of the Company. Petitioner contends that American-Hawaiian is the most nearly comparable similar business. In this respect the parties are not in disagreement. The record contains figures for the earnings of American-Hawaiian only for the 5 years immediately preceding the valuation date. In view of petitioner's concession, and since the burden of proof is upon it, we think it reasonable that any comparison with the Luckenbach earnings should be limited to the 5 years thus shown. On that approach the price-earnings ratio of American-Hawaiian applied to the earnings of the Luckenbach Company would give a relevant figure for the stock of the latter. See Rogers v. Helvering, (C.A. 2) 107 Fed. (2d) 394, *216 affirming on this point 31 B.T.A. 994. Petitioner, it is true, insists that a more accurate method of valuation would be to compare the net asset value of the two companies. But even this approach on the figures we have found to be best supported by the record and as these appear in our findings results in an estimated value of the Luckenbach stock of not very much less than the price-earnings approach. While it may be reasonable to discount these figures to some extent for the litigation then pending between petitioner and the Lewis Luckenbach heirs, see Champlin Refining Co. v. Commissioner, (C.A. 10) 123 Fed. (2d) 202, affirming a Memorandum Opinion of this Court, both the character of the litigation and its status on the valuation date lead us to conclude that any influence upon the fair market value of the shares themselves would be very much less than that asserted by petitioner. After consideration of the entire record, and without employing any single factor as conclusive but giving such effect to all elements including the litigation, as we consider warranted, see May Rogers, 31 B.T.A. 994, 1006, supra, we have arrived at the figure *217 for the value of the shares as set forth in our ultimate finding. Decision will be entered under Rules 50 and 51. Footnotes
1. In re Luckenbach's Will, 42 N.Y.S. 2d 791, 800↩.
a. Based on relating market value of total invested capital to adjusted net earnings available for invested capital. ↩
b. Excluding Merchants & Miners Transportation Co. except for 1-year basis.↩
2. Even in its reply brief petitioner refuses to come to grips with this divergent statement of the issue. It says (p. 3) of "the real question (designated "b" by respondent)," that it is "the market value of decedent's interest in the stock of the Company," whereas respondent's actual language is "(b) What was the fair market value on the optional valuation date of 52,282 1/2 shares of the common stock of Luckenbach Steamship Co., Inc. * * *" (Italics added.)↩