MICON, Administratrix, etc., *v.* LAMAR, Executor, etc.

*(Circuit Court, S. D. New York.  January 2, 1880.)*

GUARDIAN AND WARD—CIVIL WAR.—A guardian appointed by a surrogate court in the state of New York, who, together with his ward, was subsequently domiciled in a southern state during the waging of the civil war, was bound in good faith to keep his ward's money and its accumulations safely during the war, and to account for such property at its close.

SAME—REMOVAL OF TRUST FUND—CONFISCATION.—A guardian cannot lawfully remove the property of his ward in order to save it from confiscation by the United States government.

SAME—NEW GUARDIAN—RELEASE.—A new guardian may be appointed before a former guardian has been discharged, where such guardians are resident in separate state jurisdictions. A release from such new guardian will not, however, relieve the former guardian from liability, where such former guardian has unlawfully invested the funds of the ward.

SAME—RATIFICATION BY WARD.—The ratification by a ward must be made with a full knowledge of all the facts, and a full understanding of all legal rights, and the same must be clearly established by the evidence.

SAME—NEXT OF KIN—ESTOPPEL.—The acts and admissions of the next of kin of the ward, made during the life-time of the ward, are not subsequently binding upon such next of kin when she becomes the administratrix of such ward.

SAME—INVESTMENT—INTEREST WITH ANNUAL RESTS.—Where a guardian unlawfully invests trust funds, he is liable to make good the amount invested, together with interest and annual rests.

*S. P. Nash* and *G. C. Holt,* for plaintiffs.

*E. N. Dickerson* and *C. C. Beaman,* for defendant.

CHOATE, J. This was a suit brought by the plaintiff's testatrix, Ann C. Sims, in the supreme court of the state of New

York, against the defendant, as executor of Gazaway B. Lamar. The case was removed into this court by the defendant, and the plaintiff having died, the suit was revived in the name of the present plaintiff, her administratrix.

The complaint alleges that on the twenty-first day of December, 1855, the defendant's testator, Gazaway B. Lamar, was duly appointed, by the surrogate of Richmond county, guardian of the said Ann C. Sims, then an infant of about four years of age, and then residing in said county of Richmond; that he accepted said trust and gave bond as required by law; that on or about January 1, 1856, he took into his possession all the property of said infant, being more than $5,000 in cash and other property; that he never, during his life-time, rendered an account of said guardianship to the surrogate of Richmond county, or to any court having cognizance thereof, or to the plaintiff; that the said infant has become of full age and has demanded an account, which the said guardian and his executor have neglected to give. The prayer of the complaint is for an account and payment of the balance found due.

The answer of the defendant avers that the said Gazaway B. Lamar was a citizen of Georgia, and said infant was a citizen of Alabama, having a temporary residence in the city of New York, when the said Lamar was appointed guardian of said infant, as alleged in the complaint; that in the year 1861 the states of Georgia and Alabama declared themselves to have seceded from the United States, and to constitute members of the so-called Confederate States of America, whereupon a state of war arose between the United States and the Confederate States, which continued to be flagrant for more than four years after the spring of 1861; that the said Lamar and Ann C. Sims were, in the spring of 1861, citizens and residents of Georgia and Alabama, respectively, and citizens of the Confederate States, and were engaged in aiding and abetting the state of Georgia and the Confederate States in their rebellion against the United States, and so continued till January, 1865; that the United States, by various public acts, declared all the estate and property of

the said Lamar and the said Ann C. Sims to be liable to seizure and confiscation, and they were outlawed and debarred of any access to any court of the United States, whereby it was impossible for the said Lamar to appear in the surrogate's court of Richmond county, to settle and close his accounts there, and to be discharged of his liability as guardian, in consequence whereof the relation of guardian and ward ceased and determined, so far as the same depended upon the order or decree of said surrogate's court; that, for the purpose of saving the money and property of said Ann C. Sims from seizure and confiscation by the United States, the said Lamar, at the request of said Ann C. Sims and of her natural guardians, all citizens of Alabama, withdrew the funds belonging to her from the city of New York, where they were declared to be forfeited and confiscated, and invested the same, for her benefit and account, in such securities as, by the laws of Alabama and Georgia and of the Confederate States, he might lawfully do; that on the fifteenth day of March, 1867, at the written request of said Ann C. Sims and of her natural guardians, one Benjamin H. Micon was appointed her legal guardian by the probate court of Montgomery county, in the state of Alabama, where she then resided, and that said Lamar accounted with and paid over to said Micon, as guardian, all the estate with which he was chargeable, as guardian, and received from the said Micon, as guardian, a full release therefrom, and that the said Ann C. Sims ratified and confirmed the same when she became of age.

A similar suit was brought by Ann C. Sims, as administratrix of Martha M. Sims, her sister, of whom the said Lamar was at the same time appointed guardian. Martha M. Sims died in 1864, at the age of 15 years, unmarried and intestate, leaving the said Ann C. Sims her next of kin. The complaint in this second suit states a cause of action similar to that stated in the suit of Ann C. Sims. The answer in this case states the same defences of the dissolution of the relation of guardian and ward by the war; the withdrawal of the funds to save them from confiscation. It also avers that

all the rights of Martha M. Sims vested at her death in Ann C. Sims, and that the settlement with Micon as guardian, and his release, discharged the said Lamar from all liability as guardian of Martha M. Sims.

After the revival of these suits in the name of the present plaintiff, cross suits were commenced in this court by the defendant against the present plaintiff, setting up the same defences as in his answer to the original complaints, and further averring that the present plaintiff is the sole legatee under the will of Ann C. Sims, and entitled to receive in her own right whatever shall be recovered in these actions, and that the present plaintiff, as one of the natural guardians of said infants, approved and ratified all the acts of said Lamar as their guardian, and is therefore estopped to deny that those acts were in all respects legal and proper. The present plaintiff, in her answers in the cross suits, denies that she was one of the natural guardians of said infants, and denies the approval and ratification of the acts of the guardian.

The four suits have been tried together upon an agreed statement of facts.

The appointment of defendant's testator as guardian of the two infants by the proper court of the place of their domicile at the time of the appointment, and his receipt soon afterwards of moneys belonging to his wards, are admitted. The condition of his bond, which is made a part of the complaint is, that he "will faithfully in all things discharge the duty of a guardian according to law, and render a true and just account of all moneys and property received by him, and of the application thereof, and of his guardianship in all respects, to any court having cognizance thereof, when thereunto required." The letters of guardianship appoint the general guardian of the person and estate of said minor "until she shall arrive at the age of fourteen years and until another guardian shall be appointed," and requires him "to safely keep the real and personal estate of said minor, and not to suffer any waste, sale or destruction of the same, etc., and to deliver the same to her when she becomes of full age,

or to such other guardian as may be hereafter appointed, in as good order and condition as when received, and also to render a just and true account, etc., in any court having cognizance thereof, when required."

The court to which the ward resorted for an account and relief was a court of general equity jurisdiction, and therefore a court having cognizance thereof, and the causes of action alleged in the complaint are fully sustained by these admitted facts, unless the matters alleged in the answer are, if sustained by the evidence, valid defences to the guardian.

1. The first ground of defence insisted on is that by the war the relation of guardian and ward was terminated, and hence it is argued that though the former guardian continued to hold upon some kind of a trust the assets which he had received as guardian, yet that he no longer held them as guardian under and according to the laws of New York; that the guardian and ward having both acquired new domiciles out of this state and within the territory of what became, at least pending the war, an alien and a hostile state, this personal domestic relation was thereby wholly broken and did not revive when the war ceased, and the guardian was no longer accountable to the courts of New York as guardian, even after the close of the war.

I can see no ground whatever for this position, so far as concerns the care and safe-keeping of the property of the ward in the hands of the guardian, and his liability to account for it after the war was over. Doubtless during the war, if the guardian had remained there and his ward had become an alien enemy, his duties as guardian would be modified by that fact. He could not properly or legally remit funds for her support to any person in the hostile territory. But he would still be under the same obligation as before as to the safe-keeping of the property, and, whenever the ward ceased to be an alien enemy by the termination of the war, there was no legal obstacle to her calling the guardian to an account for the property so held. Even if the war dissolved the relation, the effect of such dissolution would not be greater than would be that of the termination of the guardianship by the death

of the ward; and if the ward had died before the war began, the guardian must still account to her legal representative. If he ceased to be guardian, he still remained a trustee of the property upon precisely the same trusts as to its safe-keeping, and under the same liability to account for it according to the tenor of his appointment and bond, as before. The case of a copartnership between citizens of hostile states, being dissolved by war, is cited as controlling this case. If it were wholly analogous, which it does not seem to be, I do not perceive that it would touch the present question.

By the acceptance of his appointment and his bond the defendant's testator undertook and agreed to do certain definite things with the funds he received—to keep them invested in a certain way which the law prescribes, and to account for them when required. It is alleged that he has failed to do so. It certainly is no answer for him to say that of his own free will he made himself an alien enemy of the state of New York and of the United States, and thereby discharged himself from the obligation thus assumed under the laws of New York. Yet this is what this defence amounts to, so far as it rests on his becoming a resident of Georgia, and as such engaging in the war against the United States. So far as this defence rests on the words "being an alien enemy," her right to call him to account in respect to the funds received by him as guardian before the war was suspended, not annulled, by the war.

In *Insurance Co.* v. *Davis*, 95 U. S. 430, the supreme court say: "If the agent has property of the principal in his possession or control good faith and fidelity to his trust will require him to keep it safely during the war, and to restore it faithfully at its close." If this is so of an agent it must certainly be said, with equal force, of a guardian, that good faith and fidelity to his trust will require him to keep his ward's money and its accumulations safely during the war, and to account for it at its close. Nor can the guardian better his position in this respect by himself voluntarily going into rebellion, as this guardian went from New York to Georgia to join in a rebellion, for he could not, by any act of his

own, short of the complete discharge of his duty, relieve himself from his liability.

2. The next defence urged is that the guardian, to prevent the confiscation of the ward's money, withdrew it from its investment in bank stock in New York, and sent it to Montreal, Canada, where it remained invested, by his direction, in the bonds of cities within the rebel states, and in southern railroads. This point is clearly untenable. It is not contended that the new investments made were such as a guardian is allowed to make, according to the laws of New York, and they were obviously extra hazardous. They are not to be justified on the plea that if the funds had remained here, invested according to law, they would be liable to be confiscated by the United States.

It is no part of the duty of a guardian to protect his ward's money against the lawful demands of his own government. If under such lawful demands they are seized, the guardian would no longer be responsible for them. His duty as a citizen, to interpose no obstruction to his own government in carrying on war, is his first duty. It is superior to any obligation he owes to his ward. If his ward's money was forfeited to the United States, he had no right nor duty to prevent, by its removal, the superior rights of the government over it from being asserted. Moreover, the proofs show that what he did was, under color of protecting his ward's interests, to allow the funds to be loaned to cities and other corporations which were aiding in the rebellion, and by this very act, set up in excuse, he gave aid and comfort to the enemies of his government. Such an act could not be pleaded in justification, because in itself unlawful, even if the circumstances warranted a removal of the fund to avoid confiscation, which clearly they did not.

3. Another ground of defence set up is the transfer of what remained of the fund in 1867 to a new guardian in Alabama, and his alleged release of defendant's testator. At the time of the appointment of Mr. Micon guardian by the Alabama court the infant, Ann C. Sims, was domiciled in that state. The appointment was made upon her written request, and,

as it appears by the statutes of Alabama, put in evidence, it was in all respects in conformity with those statutes, and by a court of competent jurisdiction. It is objected on the part of the plaintiff that a new guardian cannot be appointed till the former guardian is removed or superseded. This may be the rule where both guardians are appointed within the same jurisdiction. There seems, however, no legal objection to there being several guardians in several different states if the infant has property in different states which requires the care of a guardian.

The defendant's testator was appointed guardian of the person and property of the infants. When they removed from the state of New York, which they did with the relatives with whom they lived in the year 1856, his duty and power as guardian of the person may have ceased, or been suspended at least, until they might return, on the ground that his appointment under the laws of New York would give him no power to control their persons beyond the local jurisdiction of those laws; and when the infants became, as they did, domiciled in Alabama, I think the power of the state of Alabama to provide by law for the appointment of a guardian of their persons, and of such property as they might have within its jurisdiction, cannot be questioned.

The fact that there was already a guardian of some of their property in another state or country is not inconsistent with the exercise of this power; and it would certainly be most proper, and in many cases convenient, and for the true interest of the infant, that in case of a change of domicile a new guardian should be appointed within the new jurisdiction; and a transfer of funds from a former guardian to the new guardian appointed in the state of the infant's domicile might be very properly authorized by the court to which the former guardian is accountable, upon the same principles of equity and comity on which the transfer of funds in the hands of an executor or administrator, to an executor or administrator in another state, may be authorized. *Parsons* v. *Lyman*, 20 N. Y. 103.

In the present case the former guardian, Mr. Lamar,

requested of the near relatives of the infant the appointment of a new guardian. His reasons were his age and growing infirmities, and his own business cares and perplexities; and the appointment was asked for and made in accordance with his request. The reasons were valid and sufficient, and the circumstances' made it proper that the new guardian should be appointed in Alabama, and I cannot doubt that if the defendant's testator had applied to the surrogate's court, of Richmond county, for leave to resign his trust and to transfer the ward's estate to the duly appointed guardian in Alabama, his petition would have been granted. What would thus have been approved as just and right if asked for, can now be justified as done for the benefit of the ward.

Therefore, in any accounting to be had, the defendant's testator should be credited with his cash payment to the new guardian of $808.70. But beyond this the transaction referred to as a settlement with and release of the defendant's testator by the new guardian neither purported to be, nor could, if so understood and intended by the parties, be a release of the former guardian of his liability to account for the residue of the infant's estate with which he was chargeable. The new trustee merely gave a receipt for sundry securities, mostly worthless, which the defendant's testator turned over to him. They were the remains of the investments which had been made of the ward's property. But the original investments being in bank stock had been not such as the ward was, when of age, bound to accept, and by the changes of value effected by the war; and by the reinvestments made in consequence of the war and during the war the result was that the rest of the fund consisted of bonds of southern cities and southern railroads, of little value.

It is too plain for argument, it seems to me, that a new guardian has no power to accept a transfer of such properties as a full discharge of the former guardian's liability to account for and make good the moneys originally received. Such an act would be a gross abuse of his trust by the new guardian. No court would authorize or justify it, and certainly a guardian has no power, by virtue of his appointment,

thus to give away the property and rights of his ward. If the new guardian has actually realized anything from the securities transferred, I see no reason why, in the taking of the account, defendant's testator should not be credited with it.

4. The defence of a ratification by the ward is not made out by the evidence. Such a ratification must be very clearly proved, and it must appear that it was made with full knowledge of all the facts and a full understanding of the legal rights of the ward affected thereby. *Adair* v. *Bremmer*, 74 N. Y. 539–554. Neither of these circumstances is shown in this case. It is true that Ann C. Sims, in 1867, made a written request for the appointment of a guardian in Alabama, in place of her former guardian. She was then about 16 years old. She came of age June 1, 1872, and commenced this suit July 1, 1875. She was not shown to have done any act waiving her claim meanwhile. It is true that her uncle and aunt Micon, with whom she lived, had written letters expressive of their gratitude to the defendant's testator for doing as well by their niece as he had done, but these letters do not bind the ward, and if they did they are not shown to have been written with a full knowledge of the ward's rights.

5. The additional defence set up in the cross suits is also untenable. Mrs. Micon, the present plaintiff, at the time the alleged acts of approval by her were done, did not stand in the relation of a natural guardian to the infants, having any power as such over their estate. She was their aunt, and after the death of Martha M. Sims she was one of the next of kin of the surviving infant, Ann C. Sims. A guardian upon whom the law throws the real responsibility for the proper and legal investment of his ward's money cannot relieve himself from that responsibility by pleading the advice, direction or approval of his ward's relatives, however near; and Mrs. Micon, before the death of Ann C. Sims, had no such interest in the estate as would make her admissions and acts binding on her, when afterwards she became the administratrix of Ann C. Sims. Nor is the evidence of ratification and approval satisfactory, even in respect to the present plaintiff, for the reasons above stated.

6. Although the defendant's testator acted without any other real purpose, as it seems, than to do what he thought for the best interest of his ward, yet he took the risk of investing the funds in a manner not allowed by law, and he must therefore make good the amount received, with interest and annual rests. *King* v. *Talbot*, 40 N. Y. 76. The fact that down to the time of the war there had been no depreciation in fact is immaterial. The ward may now elect to reject the investments altogether. The guardian is to be allowed all payments made by him for the support and education of the infants, as the same appear on his account rendered, which are admitted to be in that respect correct.

7. The defendant's testator received for his wards from time to time a certain proportionate part of the dividends on stock of the Mechanics' Bank, a Georgia corporation. The plaintiff insists that the defendant's testator should be charged with the infants' proportionate part of the value of this stock. The evidence is not sufficient to show what interest, if any, the infants had in this stock, or whether the defendant's testor could, by appropriate proceedings in the courts of Georgia for ancillary letters of guardianship, or otherwise, have obtained possession as guardian of this interest. If he could have done so it seems that it would have been his duty to do it (*Schultz* v. *Pulver*, 11 Wend. 361;) but this question will more properly arise when an account shall have been taken and the facts are all before the court.

Decrees for an account in the original suits, and dismissing the bills in the cross-suits, with costs.