# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| ITG BRANDS, LLC, ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> REYNOLDS AMERICAN, INC. and ) <br> R.J. REYNOLDS TOBACCO ) <br> COMPANY, ) <br> ) <br> ) <br> Defendants. ) | C.A. No. 2017-0129-AGB |

REYNOLDS AMERICAN INC., and )
R. J. REYNOLDS TOBACCO )
COMPANY, )
            Counter-Plaintiffs, )
                    )
    v.                   )
                    )
ITG BRANDS, LLC, )
                    )
            Counter-Defendant. )

## MEMORANDUM OPINION

Date Submitted: June 4, 2019
Date Decided: September 23, 2019

Stephen C. Norman and Matthew F. Davis, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Robert J. Brookhiser and Elizabeth B. McCallum, BAKER & HOSTETLER LLP, Washington, D.C.; *Attorneys for Plaintiff and Counterclaim Defendant*.

Gregory P. Williams, Rudolf Koch, Robert L. Burns, and Matthew D. Perri, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Peter J. Biersteker, C. Kevin Marshall, and William D. Coglianese, JONES DAY, Washington, D.C.; *Attorneys for Defendants and Counterclaim Plaintiffs*.

**BOUCHARD, C.**

In July 2014, Reynolds American Inc. agreed to sell four cigarette brands owned by its subsidiary, R.J. Reynolds Tobacco Company, to ITG Brands, LLC for approximately $7.1 billion. As part of the transaction, ITG Brands agreed to use its "reasonable best efforts" to assume Reynolds Tobacco's obligations for post-closing sales of the four cigarette brands under agreements that Reynolds Tobacco entered into in the late 1990's with four states—Florida, Minnesota, Mississippi, and Texas. The purpose of those agreements was to settle lawsuits accusing the cigarette manufacturers of misrepresenting the risks and addictiveness of smoking. Although the sale of the four cigarette brands closed in June 2015, ITG Brands has yet to assume—over four years later—Reynolds Tobacco's obligations under its agreements with three of the four states, namely Florida, Minnesota, and Texas.

This opinion concerns the second round of disputes in this action. In round one, the court ruled in Reynolds' favor that ITG Brands' obligation to use its reasonable best efforts to assume Reynolds Tobacco's obligations under the settlement agreements did not terminate when the sale transaction closed but continues until ITG Brands actually has made reasonable best efforts to assume those obligations.[1] Round two concerns two other questions involving the interpretation of the Asset Purchase Agreement governing the sale of the four cigarette brands.

---

[1] *See ITG Brands, LLC v. Reynolds Am., Inc.*, 2017 WL 5903355 (Del. Ch. Nov. 30, 2017).

The first question, on which the parties have cross-moved for partial judgment on the pleadings, is whether ITG Brands must indemnify Reynolds for the amount of a judgment a Florida state court entered against Reynolds Tobacco in August 2018 for approximately $93 million in unpaid settlement payments concerning post-closing sales of the four cigarette brands that Reynolds sold to ITG Brands. As discussed below, because the parties each have advanced reasonable interpretations of the Asset Purchase Agreement that could lead to different results on this question, their cross-motions must be denied.

The second question, on which only Reynolds has moved for partial judgment on the pleadings, concerns state "equity fee" statutes that impose fees on tobacco companies based on their cigarette sales to pay for health care costs in that state. Specifically, Reynolds asks for a declaration that ITG Brands is not entitled under the Asset Purchase Agreement to demand, as a condition of joining the settlement agreements, protection from making payments under equity fee statutes in states that have not enacted one. This issue only concerns Reynolds Tobacco's settlement agreement with Florida. For the reasons discussed below, this motion will be granted because the plain language of the Asset Purchase Agreement supports Reynolds' position on this issue.

2

## I.    BACKGROUND

The background of this action is described in a Memorandum Opinion the court issued on November 30, 2017 (the "2017 Opinion").[2]  This opinion recites only facts that are directly relevant to the current disputes.  Those facts are drawn from the 2017 Opinion and the parties' submissions.[3]  Any additional facts are either not subject to reasonable dispute or otherwise subject to judicial notice.

In the mid-1990s, several states sued R.J. Reynolds Tobacco Company ("Reynolds Tobacco"), Lorillard Tobacco Company, and other major cigarette manufacturers for publicly misrepresenting the health risks and addictiveness of smoking.[4]  In 1997 and 1998, Reynolds Tobacco and other manufacturers—the "Settling Defendants"—entered into separate settlement agreements with four states:  Florida, Minnesota, Mississippi, and Texas.  The Asset Purchase Agreement at issue in this case defines these four states as the "Previously Settled States" and their agreements with the Settling Defendants as the "PSS Agreements."[5]  Reynolds

---

[2] *Id.*

[3] *See OSI Sys., Inc. v. Instrumentarium Corp.*, 892 A.2d 1086, 1090 (Del. Ch. 2006) ("When there are cross-motions for judgment on the pleadings, the court . . . may consider the unambiguous terms of exhibits attached to the pleadings, including those incorporated by reference.").

[4] *ITG Brands*, 2017 WL 5903355, at *2.

[5] Compl. Ex. 1 (Asset Purchase Agreement) F-1.

Tobacco's 1997 settlement agreement with Florida is referred to hereafter as the "Florida Settlement Agreement."

Under the Florida Settlement Agreement, the Settling Defendants agreed to collectively pay Florida $750 million followed by annual payments, with each Settling Defendant's annual payment determined "pro rata in proportion equal to its respective Market Share" for that year.[6]   Significantly, none of the settlement agreements with the Previously Settled States has a provision requiring a party who acquires a cigarette brand from a Settling Defendant to assume that Settling Defendant's payment obligations upon the transfer of the cigarette brand and there is no mechanism in those agreements for a transferee to join them.[7]

After Reynolds Tobacco entered into settlement agreements with three of the four Previously Settled States (Minnesota, Mississippi, and Texas), those states enacted what are called "direct-pay" or "equity fee" statutes.[8] These statutes impose fees on tobacco companies that have not entered into a settlement agreement with the state based on their cigarette sales.[9]   The purpose of equity fee statutes is to

---

[6] *ITG Brands*, 2017 WL 5903355, at *2.

[7] *Id.*

[8] Minn. Stat. Ann. § 297F.24(1)(a) (West 2018) (effective June 30, 2003); Miss. Code Ann. § 27-70-5(1)(d) (2019) (effective July 1, 2011); Tex. Health & Safety Code Ann. § 161.603(a) (West 2017) (effective Sept. 1, 2013).

[9] Minn. Stat. Ann. § 297F.24(1)(a) (West 2018) (imposing fee on "the sale of nonsettlement cigarettes"); Miss. Code Ann. § 27-70-5(1)(d) (2019) (exempting the fee on "cigarettes manufactured by any manufacturer which is a party to the tobacco settlement agreement");

compensate the states for costs attributable to cigarette use, in particular health care costs.[10] Florida did not have an equity fee statute when Reynolds Tobacco entered into the Florida Settlement Agreement and has not enacted one since then.[11]

On July 15, 2014, Reynolds American, Inc., the parent of Reynolds Tobacco (together, "Reynolds"), and Lorillard, Inc., the parent of Lorillard Tobacco Company, entered into a merger agreement.[12] At the same time, in order to facilitate regulatory approval of the merger, Reynolds American and ITG Brands entered into an Asset Purchase Agreement dated as of July 15, 2014 (the "Asset Purchase Agreement" or "APA"). In the APA, Reynolds American agreed to sell to ITG Brands for approximately $7.1 billion four cigarette brands: Winston, Salem, Kool, and Maverick.[13] The APA defines the terms "Acquired Brands" and "Acquired Tobacco Cigarette Brands" to include these four brands.[14] The Reynolds-Lorillard

---

Tex. Health & Safety Code Ann. § 161.603(a) (West 2017) (imposing fee on "non-settling manufacturer cigarettes").

[10] *ITG Brands*, 2017 WL 5903355, at *4 n.11 (citing equity fee statutes for Minnesota, Mississippi, and Texas).

[11] *Id.* at *4.

[12] *Id.* at *3.

[13] *Id.* ITG Brands is the successor of Lignum-2, L.L.C., which the APA identifies as the "Acquiror" of the Acquired Brands. Compl. ¶ 11. ITG Brands is a wholly-owned subsidiary of Imperial Tobacco Group PLC. *Id.* Ex. 1 at 1.

[14] Compl. Ex. 1 A-1.

merger and the sale of the Acquired Brands to ITG Brands both closed on June 12, 2015 (the "Closing").[15]

Attached to the Asset Purchase Agreement is a document entitled "Agreed Assumption Terms" that is part of the APA.[16] Section 2.2 of the Agreed Assumption Terms requires that ITG Brands "use its reasonable best efforts" to reach agreements with the Previously Settled States to assume Reynolds Tobacco's settlement obligations with respect to post-Closing sales of the Acquired Brands.[17]

After the Closing, neither Reynolds nor ITG Brands made payments to Florida for post-Closing sales of the Acquired Brands.[18] On January 18, 2017, Florida sued Reynolds Tobacco in Florida state court and filed a motion to join ITG Brands as a defendant in order to enforce the Florida Settlement Agreement against both Reynolds Tobacco and ITG Brands.[19]

On August 15, 2018, the Florida state court entered a final judgment against Reynolds Tobacco, but not ITG Brands, making Reynolds Tobacco liable for approximately $93 million in unpaid settlement payments from the Closing through

---

[15] 2017 WL 5903355 at *3.

[16] Compl. Ex. 1 F.

[17] *Id.* F-2 § 2.2.

[18] *ITG Brands*, 2017 WL 5903355, at *5; *see* Defs.' Opening Br. (Dkt. 78) Ex. B ¶¶ 1, 4.

[19] Norman Aff. (Dkt. 87) Ex. 23 at 1.

April 30, 2018 (the "Florida Judgment").[20]  The Florida court further held that "unless and until ITG [Brands] becomes a Settling Defendant, . . . Reynolds [Tobacco] is liable to make Annual Payments to" Florida for sales of the Acquired Brands.[21]  Reynolds subsequently posted supersedeas bonds totaling over $114 million and appealed the Florida Judgment.[22]  The appeal remains pending.

## II.  PROCEDURAL HISTORY

On February 17, 2017, ITG Brands filed this action asserting five claims for injunctive and declaratory relief.  On May 16, 2017, ITG Brands filed a motion for partial judgment on the pleadings on Count II of its complaint, seeking a declaration that any obligation ITG Brands owed to use its reasonable best efforts to reach an agreement to join the Florida Settlement Agreement terminated at the Closing.  On June 23, 2017, Reynolds filed a cross-motion for partial judgment on the pleadings, seeking a declaration that ITG Brands' duty to use its reasonable best efforts to reach an agreement to join the Florida Settlement Agreement did not terminate due to the Closing.  In the 2017 Opinion, the court ruled in Reynolds' favor on both motions.

On September 28, 2018, Reynolds filed an amended pleading, asserting four counterclaims.  On January 4, 2019, Reynolds filed a second motion for partial

---

[20] Defs.' Opening Br. Ex. B ¶¶ 1, 3.

[21] *Id.* ¶ 4.

[22] *Id.* Ex. C, Exs. 1, 2.

judgment on the pleadings, seeking declarations to resolve its Counterclaim III and to partially resolve its Counterclaim I. On March 11, 2019, ITG Brands filed a cross-motion for partial judgment on the pleadings with respect to Reynolds' Counterclaim III but not with respect to its Counterclaim I.

## III. ANALYSIS

The parties' motions tee up two questions. The first question is whether ITG Brands must indemnify Reynolds for any liability imposed on Reynolds Tobacco for post-Closing settlement payments on the Acquired Brands, in particular the Florida Judgment, under subsections (iv) and/or (v) of Section 2.01 of the APA. The second question is whether ITG Brands is entitled under Section 2.2 of the Agreed Assumption Terms to receive protection from a state that does not have an equity fee statute (*i.e.*, Florida) for the possibility that it may enact one in the future. These questions are addressed below in Sections B and C, respectively.

### A. Legal Framework

This court may grant a motion for judgment on the pleadings "when no material issue of fact exists and the movant is entitled to judgment as a matter of law."[23] Judgment on the pleadings "is a proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of

---

[23] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P*., 624 A.2d 1199, 1205 (Del. 1993).

fact."[24]  Put differently, "[w]hen analyzing a contract on a motion for judgment on the pleadings, this Court will grant such a motion only if the contract provisions at issue are unambiguous."[25]

Delaware law, which governs the APA,[26] "adheres to the objective theory of contracts, *i.e.*, a contract's construction should be that which would be understood by an objective, reasonable third party."[27]  When interpreting a contract, this court "will give priority to the parties' intentions as reflected in the four corners of the agreement," construing the agreement as a whole and giving effect to all of its provisions.[28]  A court will "construe the contract in accordance with [its] plain meaning and will not resort to extrinsic evidence to determine the parties' intentions."[29]  In discerning the plain meaning of a contract, the court may look to the grammatical construction of a contractual provision.[30]

---

[24] *Lillis v. AT&T Corp.*, 904 A.2d 325, 329-30 (Del. Ch. 2006) (citations and quotation marks omitted).

[25] *Cooper Tire & Rubber Co. v. Apollo (Mauritius) Hldgs. Pvt. Ltd.*, 2013 WL 5787958, at *4 (Del. Ch. Oct. 25, 2013).

[26] Compl. Ex. 1 § 12.12.

[27] *Salamone v. Gorman*, 106 A.3d 354, 367-68 (Del. 2014) (internal quotation marks omitted).

[28] *Id.* (citing *GMG Capital Invs., LLC. v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

[29] *BLG Hldgs. LLC v. enXco LFG Hldg., LLC*, 41 A.3d 410, 414 (Del. 2012).

[30] *See, e.g. Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146 (Del. 2010) (resolving grammatical dispute to determine the clear and unambiguous meaning of a contractual provision); *see also Viking Pump, Inc. v. Liberty Mut. Ins. Co.*, 2007 WL 1207107, at *17 n.97 (Del. Ch. Apr. 2, 2007, revised Apr. 13, 2007) (Strine, V.C.) (quoting *Wirth & Hamid*

Under Delaware law, "[a]mbiguity does not exist simply because the parties disagree about what the contract means. . . . Rather, contracts are ambiguous when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[31] "Clear and unambiguous language . . . should be given its ordinary and usual meaning."[32]

## B. The Parties' Cross-Motions Concerning Section 2.01(c) of the APA Must Be Denied Because Each Side Has Advanced a Different Interpretation That is Reasonable

Reynolds seeks entry of partial judgment on the pleadings on its Counterclaim III "in the form of a declaration that, to the extent that [Reynolds Tobacco] is held to bear any liability for post-Closing settlement payments on the Acquired Brands, ITG Brands in the APA assumed this liability."[33] Reynolds asserts it is entitled to this relief under the plain terms of subsections (iv) and/or (v) of Section 2.01 of the APA. Section 2.01 enumerates a series of "Assumed Liabilities" for which ITG

---

*Fair Booking, Inc. v. Wirth*, 192 N.E. 297, 299 (N.Y. 1934)) ("[P]unctuation and grammatical construction are reliable signposts in the search [for contractual intent]."); 11 *Williston on Contracts* § 32:9 (4th ed.) ("Courts often pay attention to grammar and punctuation in determining the proper interpretation of a contract . . . .").

[31] *Cooper Tire*, 2013 WL 5787958, at *4 (citations and internal quotation marks omitted).

[32] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006) (quoting *Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)).

[33] Defs.' Opening Br. 2.

Brands is obligated to indemnify Reynolds Tobacco under Section 11.02(a)(vi) of the APA.[34]

Reynolds seeks declaratory relief now even though it acknowledges that indemnification "is not yet ripe" because "the litigation in Florida has not concluded."[35]  In this respect, Reynolds focuses on the Florida Judgment, as will the court, while pointing out that two of the other Previously Settled States (Minnesota and Texas) also are seeking judgments against Reynolds concerning ITG Brands' post-Closing sales of the Acquired Brands.[36]

ITG Brands counters that the subsections 2.01(c)(iv) and (v) do not apply to the Florida Judgment "because section 2.01(c)(vii), along with the Agreed Assumption Terms referenced in that Article, govern assumption of settlement liabilities."[37]  ITG Brands has cross-moved for judgment on the pleadings "that

---

[34] In general terms, Section 11.02(a)(vi) of the APA obligates ITG Brands to indemnify Reynolds against all "Losses" incurred as a result of "any Assumed Liability."  Compl. Ex. 1 § 11.02(a)(vi).

[35] Defs.' Opening Br. 2, 13; Defs.' Reply & Opp'n Br. (Dkt. 91) 32.

[36] On March 23, 2018, the State of Minnesota filed a motion in Minnesota state court against Reynolds Tobacco to require it to make settlement payments for ITG Brands' post-Closing sales of the Acquired Brands.  Defs.' Opening Br. Ex. D.  On January 29, 2019, Philip Morris USA filed a motion in Texas federal court to enforce the Texas settlement agreement against Reynolds and ITG Brands "with respect to cigarettes being sold under the Acquired Brands."  Prisbrey Aff. (Dkt. 95) Ex. 4.

[37] Pl.'s Opp'n & Opening Br. (Dkt. 85) 31.

11

sections 2.01(c)(vii) and 11.02(a)(v) exclusively govern any obligation it may have to reimburse Reynolds for settlement payments."[38]

The three subsections of Section 2.01(c) on which the parties rely—subsections (iv), (v), and (vii)—are recited below:

> (c) <u>Assumed Liabilities</u>.  Upon the terms and subject to the conditions set forth in this Agreement (including Section 2.01(d)), the Acquiror hereby agrees, effective as of the Closing . . . to assume and thereafter to pay, discharge and perform in accordance with their terms only the following Liabilities of the Sellers, and no other Liabilities of the Sellers or any other Person or any other Liabilities whatsoever (the "Assumed Liabilities"): . . .
>
> > (iv) all Liabilities (other than Excluded Liabilities) to the extent arising, directly or indirectly, out of . . . the use of the Transferred Assets, in each case from and after the Closing;
> >
> > (v) other than Straddle Tobacco Action Liabilities, all Liabilities arising out of or in connection with any Action to the extent relating to the development, manufacture, packaging, labeling, production, delivery, sale, resale, distribution, marketing, promotion, use or consumption of, or exposure to, tobacco products, including smoking and health-related claims, in each case, to the extent relating to the period commencing after the Closing Date and related to one or more of the Acquired Tobacco Cigarette Brands . . .
> >
> > (vii) subject to the Agreed Assumption Terms, all Liabilities under the State Settlements in respect of the Acquired Tobacco Cigarette Brands that relate to the period after the Closing Date . . . .[39]

---

[38] *Id.*  In general terms, Section 11.02(a)(v) of the APA obligates ITG Brands to indemnify Reynolds against all "Losses" incurred as a result of ITG Brands' breach of the Agreed Assumption Terms.  Compl. Ex. 1 § 11.02(a)(v).

[39] Compl. Ex. 1 §§ 2.01(c)(iv), (v), (vii).

The Asset Purchase Agreement defines the term "Liability" broadly to mean "liabilities, claims, demands, expenses, commitments, Losses, costs or obligations of every kind and description."[40] Section 2.01(d) is a reciprocal provision to Section 2.01(c) that specifies certain Liabilities that ITG Brands did not assume, which are defined as the "Excluded Liabilities."[41]

In my opinion, for the reasons discussed below, Reynolds and ITG Brands both have advanced reasonable interpretations of the APA that could lead to different outcomes concerning whether ITG Brands would be required to indemnify Reynolds for the Florida Judgment, assuming it is upheld on appeal.

Beginning with Reynolds, its primary contention is that ITG Brands is obligated to pay the Florida Judgment under Section 2.01(c)(v).[42] To repeat, that provision states that ITG Brands assumed "all Liabilities arising out of or in connection with any Action to the extent relating to the . . . sale, . . . use or consumption of . . . tobacco products . . . to the extent relating to the period commencing after the Closing Date and related to one or more of the Acquired

---

[40] *Id.* A-8.

[41] *Id.* § 2.01(d), A-5.

[42] Because the court finds that Reynolds' construction of Section 2.01(c)(v) is reasonable, it is not necessary to address Reynolds' alternative argument under Section 2.01(c)(iv).

Tobacco Cigarette Brands."[43]   Thus, to be assumed by ITG Brands under Section 2.01(c)(v), the liability must:  (i) arise out of an "Action," (ii) relate to the sale or consumption of "Acquired Tobacco Cigarette Brands," and (iii) relate to the post-Closing period.  The Florida Judgment satisfies each of these requirements.

The APA defines "Action" to mean "any claim, suit, . . . or other proceeding of any nature . . . by or before any court, arbitrator or Governmental Authority or similar body."[44]  A Florida state court entered the Florida Judgment in a proceeding in which Florida sued both Reynolds and ITG Brands to obtain payments due under the Florida Settlement Agreement.[45]  This lawsuit plainly constitutes an "Action" under the APA because it is a "suit" before a "court," and the Florida Judgment unquestionably arose out of that action.[46]  Thus, the first requirement of Section 2.01(c)(v) is satisfied.  ITG Brands does not contend otherwise.

The APA defines "Acquired Tobacco Cigarette Brands" to include the Winston, Salem, Kool, and Maverick brands that Reynolds transferred to ITG Brands.[47]  By its terms, the Florida Judgment pertains to these cigarette brands.  It

---

[43] Compl. Ex. 1 § 2.01(c)(v).   This subsection excludes "Straddle Tobacco Action Liabilities," but neither party has argued that this exclusion is relevant here.

[44] *Id.* A-1.

[45] *See* Norman Aff. (Dkt. 86) Ex. 2.

[46] *See* Defs.' Opening Br. Ex. B.

[47] Compl. Ex. 1 A-1.

14

expressly provides that "unless and until ITG becomes a Settling Defendant, the Court holds that Reynolds is liable to make Annual Payments to the State under the Florida Settlement Agreement for the sales of cigarettes under the Winston, Kool, Salem, and Maverick brands it transferred to ITG."[48] Thus, the second requirement of Section 2.01(c)(v) is satisfied. Again, ITG Brands does not contend otherwise.

Finally, the Florida Judgment expressly pertains only to sales made during the post-Closing period. As noted above, the transaction whereby ITG Brands purchased the Acquired Brands closed on June 12, 2015. Referencing that date, the order granting Florida's enforcement motion explains that Florida filed its motion "[b]ecause Reynolds modified its payments under the Florida Agreement *subsequent to the mid-2015 closing* and justified the new payments exclusively on the fact that [ITG Brands], not Reynolds, was selling the cigarettes under the four brands."[49] Paralleling that time frame, the Florida Judgment expressly provides that the awarded amount is based on "all payments due as of the date of this Judgment *for the period of June 12, 2015 through April 30, 2018*."[50]

ITG Brands contends that Section 2.01(c)(v) does not apply to the Florida Judgment on the theory that the Florida Judgment "relates to Reynolds' own pre-

---

[48] Defs.' Opening Br. Ex. B ¶ 4.

[49] Norman Aff. (Dkt. 86) Ex. 2. at 2-3 (emphasis added).

[50] Defs.' Opening Br. Ex. B ¶ 1. (emphasis added).

15

closing conduct and to its pre-closing decision to enter into the settlements requiring the payments at issue."[51] This argument is without merit because it is directly contradicted by the plain terms of the Florida Judgment and the order granting Florida's enforcement motion. As just explained, they both expressly provide that the liability pertains only to sales of the Acquired Tobacco Cigarette Brands made during the post-Closing period.[52]

In sum, for the reasons discussed above, Reynolds has articulated a reasonable interpretation of Section 2.01(c)(v) of the APA that supports the conclusion that ITG Brands would be obligated to indemnify Reynolds for the amount of the Florida Judgment if it is upheld on appeal.

Turning to ITG Brands, its core argument looks beyond the four corners of Section 2.01(c)(v) to consider the interplay of that provision with Section 2.01(c)(vii) of the APA, which governs "Liabilities under the State Settlements in respect of the Acquired Tobacco Cigarette Brands" for the post-Closing period. Relying on the specific-over-the-general rule of contract interpretation, ITG Brands argues that Section 2.01(c)(vii) and not Section 2.01(c)(v) was intended to determine whether ITG Brands is obligated to indemnify Reynolds for any liability imposed on Reynolds Tobacco for post-Closing settlement payments on the Acquired Brands

---

[51] Pl.'s Opp'n & Opening Br. 3, 20-21.

[52] Norman Aff. (Dkt. 86) Ex. 2.at 2-3; Defs.' Opening Br. Ex. B ¶ 1.

16

under its settlement agreements with the Previously Settled States. In support of this argument, ITG Brands relies heavily on our Supreme Court's decision in *DCV Holdings, Inc. v. ConAgra, Inc.*[53]

In that case, DCV Holdings acquired a company that "suffered a decline in profits" and was "implicated . . . in antitrust violations."[54] DCV Holdings sued the sellers of the company seeking, among other relief, indemnification under the Purchase Agreement for liabilities resulting from the antitrust violations.[55] Two provisions of that contract were at issue: Sections 3.9 and 3.13.

Section 3.9 was "an all-inclusive warranty" that did not contain a knowledge qualifier.[56] It stated: "None of the Companies has any liabilities or obligations of any nature" other than three inapplicable exceptions.[57] By contrast, Section 3.13 focused on violations of law and contained a knowledge qualifier. It stated: "To the knowledge of Sellers, the business is not being and has not been conducted, and none of the Companies has been, or is in violation of any applicable Law . . . ."[58] Determining whether or not DCV Holdings was entitled to indemnification for the

---

[53] 889 A.2d 954 (Del. 2005).

[54] *Id.* at 956.

[55] *Id.*

[56] *DCV Hldgs., Inc. v ConAgra, Inc.*, 2005 WL 698133, at *9 (Del. Super. Ct. Mar. 24, 2005).

[57] *Id.*

[58] *Id.* at *11.

17

costs associated with the antitrust violations turned on which of these two provisions applied to the parties' dispute.[59]

In analyzing this question, our Supreme Court explained that "the specific provision ordinarily qualifies the meaning of the general one" in situations "where specific and general provisions conflict."[60] Applying this rule of contract interpretation, the high court affirmed the Superior Court's ruling that Section 3.13, and not Section 3.9, controlled. It reasoned that "[t]he more specific Section 3.13, which limits that section's scope to violations of the law that were known to the Sellers, is the narrower of the two provisions."[61] The high court also found that the Superior Court "did not err in holding that Sections 3.13 and 3.9 were in conflict" based on the fact that the two sections would lead to opposite results concerning liability.[62]

Turning to this case, ITG Brands argues that subsection (vii) of Section 2.01(c) is a more specific provision than subsection (v) because subsection (vii)

---

[59] *Id.* at *9-10.

[60] *DCV Hldgs.*, 889 A.2d at 961; *see also Sonitrol Hldg. Co. v. Marceau Investissements*, 607 A.2d 1177, 1184 (Del. 1992) (stating that "where there is an inconsistency between general provisions and specific provisions, the specific provisions ordinarily qualify the meaning of the general provisions"); Restatement (First) of Contracts § 236(c) (same).

[61] *DCV Hldgs.*, 889 A.2d at 962.

[62] *Id.* ("If Section 3.9 governed, the Sellers would be liable to indemnify the Buyer for unknown violations of law, contrary to the knowledge qualifiers in Section 3.13—a result that would render that qualifier meaningless.").

specifically concerns "Liabilities under the State Settlements in respect of the Acquired Tobacco Cigarette Brands" for the post-Closing period while subsection (v) encompasses a wide range of liabilities for the post-Closing period arising from legal proceedings. ITG Brands argues further that Sections 2.01(c)(v) and 2.01(c)(vii) conflict because they could lead to different outcomes over whether ITG Brands would be liable for the Florida Judgment. Thus, according to ITG Brands, subsection (vii) and not subsection (v) should control here.

The potential for conflict between these two provisions does exist. As discussed above, Reynolds has advanced a reasonable interpretation of Section 2.01(c)(v) whereby ITG Brands would be liable for the Florida Judgment if it is upheld on appeal. And, as Reynolds acknowledges, it is possible that ITG Brands may not incur this same liability under Section 2.01(c)(vii).[63] This is because the assumption of liabilities under subsection (vii) is expressly made "subject" to the Agreed Assumption Terms, Section 2.2 of which provides that ITG Brands "shall use its reasonable best efforts" to assume Reynolds' obligations under the settlement agreements with the Previously Settled States.[64] Thus, the possibility exists that ITG Brands ultimately may not assume Reynolds' obligations under the Florida

---

[63] Tr. (Dkt. 103) 21-23 (June 4, 2019).

[64] Compl. Ex. 1 F-2 § 2.2.

19

Settlement Agreement under Section 2.10(c)(vii), *i.e.*, if ITG Brands failed to join that agreement after using its "reasonable best efforts" to do so.

Reynolds argues that *DCV Holdings* is distinguishable because the contract there "involved language expressly making one provision more specific than another on the same question" while, here, Sections 2.01(c)(v) and 2.01(c)(vii) of the APA "appear in parallel in § 2.01(c)'s list of seven Assumed Liabilities."[65] According to Reynolds, "[n]othing makes §2.01 (c)(vii) more 'specifically' on point than [§2.01(c)(v)] in the circumstances of the Liabilities *at issue in these motions*—the *absence* of a joinder or a question of breach of the obligation to pursue joinder; and the *presence* of a judgment from an Action for payments owed based on post-Closing sales of the Acquired Brands."[66]

In my view, Reynolds' position takes too limited a view of the specific-over-the-general rule of contract interpretation for me to find at the pleadings stage that its interpretation of Section 2.01(c) of the APA is the only reasonable one. As just explained, in arguing that neither of the two subsections at issue is more specific than the other, Reynolds focuses on *the means by which ITG Brands could become liable* for post-Closing settlement payments under the Florida Settlement Agreement, *i.e.*, by indemnifying Reynolds for the amount of the Florida Judgment

---

[65] Defs.' Reply & Opp'n Br. 15-16.

[66] *Id.*

20

under subsection (v) or by assuming Reynolds' post-Closing obligations in the Florida Settlement Agreement under subsection (vii). In applying the specific-over-the-general rule of contract interpretation, however, it would be reasonable to focus instead on *the underlying financial obligation itself*.

The underlying financial obligation pertains to settlement payments for post-Closing sales of the Acquired Tobacco Cigarette Brands, which is governed by the Florida Settlement Agreement. Section 2.01(c)(vii) of the APA and the Agreed Assumption Terms referenced therein specifically address ITG Brands' obligation to use its reasonable best efforts to assume Reynolds' obligation to pay those settlement payments as well the settlement payments due under the settlement agreements with the other Previously Settled States. Section 2.01(c)(v) never discusses or even mentions any of the settlement agreements with the Previously Settled States. Rather, Section 2.01(c)(v) addresses liabilities arising out of legal proceedings relating to a wide range of subjects, *i.e.*, "the development, manufacture, packaging, labeling, production, delivery, sale, resale, distribution, marketing, use or consumption of, or exposure to tobacco products, including health-related claims."[67]

---

[67] Compl. Ex. 1 § 2.01(c)(v).

21

"The primary goal of contract interpretation is to satisfy the reasonable expectations of the parties at the time they entered into the contract," which "often requires courts to engage in an analysis of the intent or shared understanding of the parties at the time of the contract."[68] In performing this task, Delaware courts favor specific over general provisions when they conflict because of "the reasonable inference that specific provisions express more exactly what the parties intended."[69] In my view, it is reasonable at the pleadings stage to construe Section 2.01(c)(vii) as more specific than Section 2.01(c)(v) when one focuses on the underlying financial obligation at issue on the parties' cross-motions, because Section 2.01(c)(vii) specifically addresses the Florida Settlement Agreement from which the obligation to make settlement payments to Florida for post-Closing sales of the Acquired Tobacco Cigarette Brands arises.[70]

Finally, to repeat, our law provides that "the specific provision ordinarily qualifies the meaning of the general one" in situations "where specific and general provisions conflict."[71] Here, as discussed above, Sections 2.01(c)(v) and 2.01(c)(vii) have the potential to conflict because ITG Brands would be liable for the Florida

---

[68] *Demetree v. Commonwealth Tr. Co.*, 1996 WL 494710, at *3 (Del. Ch. Aug. 27, 1996) (Allen, C.).

[69] *Katell v. Morgan Stanley Gp., Inc.*, 1993 WL 205033, at *4 (Del. Ch. June 8, 1993).

[70] *Id.* (finding that one section is "the more specific clause as to the conduct of pending litigation" because it "mentions litigation by name").

[71] *DCV Hldgs.*, 889 A.2d at 961.

Judgment (if upheld on appeal) under subsection (v) if that provision applies, but would not necessarily be liable for the Florida Judgment under subsection (vii).

*****

For the reasons explained above, the parties have advanced two different interpretations of Section 2.01(c), both of which are reasonable. If a contract is "reasonably or fairly susceptible of different interpretations or may have two or more different meanings," then it is ambiguous.[72] When a contractual provision is ambiguous, judgment on the pleadings is not appropriate to resolve the ambiguity.[73] Rather, the court will need to examine whatever parol evidence may exist on the interplay between Sections 2.01(c)(v) and 2.01(c)(vii) before determining which of the parties' competing interpretations represents their shared intent. Accordingly, the parties' cross-motions for partial judgment on the pleadings as to the application of Section 2.01(c) are denied.

---

[72] *Cooper Tire*, 2013 WL 5787958, at *4 (citations and internal quotation marks omitted).

[73] *See, e.g.*, *Cypress Assocs., LLC v. Sunnyside Cogeneration Assocs. Project*, 2007 WL 148754, at *3 (Del. Ch. Jan. 17, 2007) (Strine, V.C.) (stating that if a contract is ambiguous, "it is generally improper to grant a motion for judgment on the pleadings because to do so would resolve the ambiguity on an incomplete record not shaped by discovery").

**C.    Reynolds is Entitled to a Partial Judgment that Section 2.2 of the Agreed Assumption Terms Does Not Entitle ITG Brands to Demand Protection from a Hypothetical Equity Fee Statute As a Condition of Joining the Florida Settlement Agreement**

Reynolds seeks a declaration with respect to its Counterclaim I that Section 2.2 of the Agreed Assumption Terms "does not entitle ITG Brands to demand, as a condition of joining a settlement agreement of a Previously Settled State . . . protection from 'double payments' due to an 'equity fee' law in a State that has no such law."[74]  ITG Brands has not cross-moved on this issue.  The issue apparently has been a sticking point in ITG Brands' negotiations about joining the Florida Settlement Agreement, as ITG Brands has sought to include a provision protecting it from equity fees even though Florida does not have an equity fee statute.[75]

Section 2.2 of the Agreed Assumption Terms provides as follows:

> The Acquiror, with the assistance and cooperation of RAI and Lorillard in communications and negotiations as required by the Agreement, shall use its reasonable best efforts to reach agreements with each of the Previously Settled States, by which the Acquiror will assume, as of the Closing, the obligations of a Settling Defendant under the PSS Agreement with each such State, with respect to the Acquired Tobacco Cigarette Brands, on the same basis as the Settling Defendants prior to the Closing. Provided, however, that such agreements shall include terms providing either that any direct-pay statute (also known as an equity-fee law or NPM-fee law) of a Previously Settled State does not apply to the Acquired Tobacco Cigarette Brands or that, if the Acquiror is required to make payments with respect to Acquired Tobacco Cigarette Brands under a direct-pay statute (or any distributor

---

[74] Defs.' Opening Br. 2.

[75] *See* Norman Aff. (Dkt. 87) Exs. 17, 21; Tr. 81 (June 4, 2019).

or other party is required to make such payments with respect to the Acquired Tobacco Cigarette Brands), the Acquiror will receive a credit against otherwise due payments under the PSS settlement equal to the full payments made.[76]

The court analyzed this provision in its 2017 Opinion. The first sentence of Section 2.2 defines ITG Brands' obligation to attempt to join the settlement agreements with the Previously Settled States. The first clause of the first sentence "requires ITG Brands to use its reasonable best efforts to reach agreements with each of the Previously Settled States," and the second clause "describes the nature of the agreements to be reached."[77] The second clause means that "under the PSS settlement agreements, ITG Brands will assume, as of the Closing, the same obligations that the Settling Defendants had prior to the Closing."[78] In other words, "when ITG Brands assumes the obligations of the Settling Defendants, it will step into the shoes that Reynolds Tobacco occupied prior to the Closing."[79]

The second sentence is a proviso that establishes a condition to which the obligation in the first sentence is subject. The proviso addresses only one subject—equity fee statutes. Before examining the text of the proviso, it is helpful to put the provision in context.

---

[76] Compl. Ex. 1 F-2 § 2.2.

[77] *ITG Brands*, 2017 WL 5903355, at *7 (internal quotation marks omitted).

[78] *Id.*

[79] *Id.*

As explained above, three of the four Previously Settled States (Minnesota, Mississippi, and Texas, but not Florida) enacted equity fee statutes *after* Reynolds entered into settlement agreements with those states in the late 1990's.[80] Reynolds and the other Settling Defendants had no protection *under the PSS Agreements* from the risk of making double payments if one of the Previously Settled States subsequently enacted an equity fee statute. The Settling Defendants, however, were afforded such protection when Minnesota, Mississippi, and Texas later enacted equity fee statutes because they were exempted from making equity fee payments under those statutes.[81]

Given this context, it makes sense that ITG Brands would secure for itself in the proviso to Section 2.2 the right to obtain the same protection from the risk of making double payments that Reynolds and the other Settling Defendants received from the three Previously Settled States that enacted equity fee statutes. As the court explained in its 2017 Opinion, albeit in a different context, "the proviso makes clear that, if a Previously Settled State *has* a direct-pay statute, ITG Brands is entitled to obtain contractual protection against making double payments on the Acquired Tobacco Cigarette Brands, *i.e.*, either the state will agree to exempt ITG Brands from

---

[80] *See supra* note 8 and accompanying text.

[81] *See supra* note 9 and accompanying text. *See also* Defs.' Reply & Opp'n Br. 39-40; Pl.'s Corrected Reply Br. (Dkt. 98) 30.

the direct-pay statute or will give it a credit for any payments it makes under the statute."[82]  The proviso thus contemplates two options to protect against making double payments:  either obtain (i) an exemption from the statute or (ii) a credit.

In opposing Reynolds' motion, ITG Brands argues that it secured for itself not only the protection from the risk of making double payments that Reynolds had obtained before entering into the Asset Purchase Agreement, but a form of protection that neither Reynolds nor any of the other Settling Defendants ever had. Specifically, ITG Brands contends that Section 2.2 entitles it to demand as a condition of joining the settlement agreements with the Previously Settled States that it be protected from the risk of making double payments with respect to an equity fee statute that does not even exist.  The only state this concerns is Florida.  In my opinion, this position cannot be squared with the text of Section 2.2.

Critically, the first option in the proviso—seeking an exemption—states that the joinder agreement "shall include terms providing . . . that any direct-pay statute . . . of a Previously Settled State ***does*** not apply to the Acquired Tobacco Cigarette Brands."[83]  The verb "does" is in the present tense, which indicates that the equity fee statute must be in existence when ITG Brands is negotiating the joinder

---

[82] *ITG Brands*, 2017 WL 5903355, at *8 (emphasis added).

[83] Compl. Ex. 1 F-2 § 2.2 (emphasis added).

27

agreement.[84] ITG Brands offers no competing interpretation of this option. Thus, it is conceded that the first option only applies to the three Previously Settled States that have equity fee statutes in place: Minnesota, Mississippi, and Texas.

ITG Brands' only textual argument focuses on the second option—seeking a credit. The relevant language states that the joinder agreement "shall include terms providing . . . that, *if* the Acquiror is required to make payments with respect to Acquired Tobacco Cigarette Brands under a direct-pay statute . . . , the Acquiror will receive a credit against otherwise due payments under the PSS settlement equal to the full payments made."[85] According to ITG Brands, this part of the proviso "is clearly conditional in the future" and, therefore, the proviso *as a whole* should apply to both existing and hypothetical equity fee statutes.[86] I disagree.

To start, it is not disputed that the second option, like the first option, covers existing equity fee statutes that three of the Previously Settled States enacted before the parties here entered into the Asset Purchase Agreement. For example, during joinder negotiations, one of those three states could require ITG Brands to make payments under an existing equity fee statute by declining (for whatever reason) to

---

[84] This court has considered the tense of verbs when interpreting contract provisions. *See, e.g.*, *Winshall v. Viacom Int'l, Inc.*, 2012 WL 6200271, at \*6 (Del. Ch. Dec. 12, 2012) (noting use of present tense as limiting meaning of contract provision), *aff'd* 76 A.3d 808 (Del. 2013).

[85] Compl. Ex. 1 F-2 § 2.2 (emphasis added).

[86] Pl.'s Opp'n & Opening Br. 33.

grant ITG Brands an exemption from the statute. In that case, ITG Brands would be entitled to demand the specified credit as a condition of joining the settlement agreement of that state. This scenario fits within the plain language of the "if the Acquiror is required to make payments" trigger in the second option. The parties do not disagree on this point.

Most importantly, when the two options are considered together, the only reasonable way to read the proviso in its entirety, in my opinion, is that it was intended only to apply to existing equity fee statutes. This follows from (i) the undisputed fact that the first option—seeking an exemption—is written in the present tense and plainly applies only to the three Previously Settled States that have equity fee statutes and (ii) it would make no sense to construe second option—seeking a credit—to apply to a different group of states than the first option. Put differently, even if the second option theoretically could be read *in isolation* to apply to existing as well as hypothetical future equity fee statutes (*i.e.*, to apply to all four of the Previously Settled States), it would be nonsensical to read the proviso *as a whole* that way given that the two options are interchangeable paths to achieve the same result and the first option indisputably uses the present tense and applies only to the three Previously Settled States that have enacted equity fee statutes.

Indeed, construing the second option to cover all four Previously Settled States, while construing the first option to cover only three of those states, would

lead to an absurd result. Doing so would mean that the only protection ITG Brands could demand as a condition of joining the Florida Settlement Agreement would be to seek a credit from a yet-to-be enacted equity fee statute, and that demanding an exemption as a condition of joinder would be off the table even though that option substantively would provide the same protection as the specified credit. In my opinion, no reasonable person would have sought, much less accepted, this result.[87]

It is fundamental that contracts must be read in a manner "that is reasonable and that harmonizes the affected contract provisions."[88] Here, the two options in the proviso easily can be harmonized by construing both options to apply only to existing equity fee statutes. For this and the other reasons explained above, it is my opinion that the only reasonable interpretation of the proviso in Section 2.2 read in its entirety is that the parties intended it to apply only to equity fee statutes in existence when a joinder agreement is being negotiated. Accordingly, the proviso in Section 2.2 does not apply to the Florida Settlement Agreement.

ITG Brands advances a final argument that goes outside the text of the APA. Specifically, it asserts that "Reynolds' course of performance and delay" in seeking

---

[87] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010) ("An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract.").

[88] *Axis Reinsurance Co. v. HLTH Corp.*, 993 A.2d 1057, 1063 (Del. 2010); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 180 (2012) ("[T]here can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously.").

the requested declaration "confirms its understanding that Section 2.2's final clause applies to Florida."[89] It is well-established that "[if] a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity."[90] Because the court has concluded from the plain terms of the APA that the proviso in Section 2.2 supports only one reasonable interpretation and is not ambiguous, course of dealing evidence is irrelevant and may not be considered by the court.[91]

## IV. CONCLUSION

For the foregoing reasons, both parties' motions for partial judgment on the pleadings regarding the application of Section 2.01(c) to the Florida Judgment are denied, and Reynolds' motion for partial judgment on the pleadings regarding Section 2.2 of the Agreed Assumption Terms is granted. The parties are directed to submit a form of order to implement this decision within five business days.

**IT IS SO ORDERED.**

---

[89] Pl.'s Opp'n & Opening Br. 34-35.

[90] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

[91] *Id. at* 1233 ("In construing an *ambiguous* contractual provision, a court may consider evidence of prior agreements and communications of the parties as well as trade usage or course of dealing.") (emphasis added).

31